## FORD ET AL. *v.* UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 312. Argued October 26, 27, 1926.—Decided April 11, 1927.

1. In an indictment charging conspiracy to commit offenses against laws of the United States, an allegation that it was also to violate a treaty (prescribing no offense) may be rejected as surplusage. P. 602.

2. Ignoring surplusage is not amending the indictment. P. 602.

3. An indictment charging a continuous conspiracy to commit offenses against the United States by introducing and transporting liquor in the United States in violation of the National Prohibition Act, and by importing it into the United States in violation of the Tariff Act, is not bad for duplicity. P. 602.

4. In determining the admissibility in a criminal case of evidence of a seizure of property and persons, questions of fact affecting the legality of the seizure are decided by the court without the jury. P. 605.

5. Where the District Court has jurisdiction of the offense charged, the question whether the defendants were wrongfully brought into its custody through an unlawful seizure on the high seas must be raised by a plea to the jurisdiction over their persons and is waived by a plea of not guilty. P. 606.

6. The treaty of May 22, 1924, with Great Britain, which, within limits stated, permits a British vessel in extraterritorial waters to be boarded and searched by United States authorities, and, if there is reasonable cause for belief that she has committed or is committing or attempting to commit an offense against the laws of the United States prohibiting the importation of alcoholic beverages, to be seized and taken into port " for adjudication in accordance with such laws,"—should be construed liberally, in effectuation of its purpose, as contemplating that not only the ship but the cargo and the persons on board may be taken in for adjudication. Pp. 609, 618.

7. Principle of *Expressio unius est exclusio alterius*, considered. P. 611.

8. It is permissible under the treaty to prosecute the persons so seized and brought into the United States not only for illegal importation but also for conspiracy to commit that offense—where the conspiracy charged (under Crim. Code § 37) included as overt acts actual importation and an attempt. *United States* v. *Rauscher*, 119 U. S. 407, distinguished. Pp. 614, 616.

9. One may be guilty as a party to a conspiracy to import liquors into the United States in violation of the Prohibition Law, followed by overt acts in this country, although he was and remained outside of its territorial jurisdiction. P. 619.

10 F. (2d) 339, affirmed.

CERTIORARI (271 U. S. 652) to a judgment of the Circuit Court of Appeals affirming a conviction of conspir-

acy to import liquor into the United States in violation
of the Prohibition Law.   See 3 F. (2d) 643.

*Messrs. J. Harry Covington, Harold C. Faulkner,* and
*Marion De Vries,* with whom *Messrs. Dean G. Acheson,
George Roscoe Davis,* and *Louis V. Crowley* were on the
brief, for petitioners.

The history of the legal and diplomatic situation which
led to the treaty of May 22, 1924, shows that friction
had developed between the United States and Great
Britain because of the seizure of British vessels by the
United States beyond the territorial waters of this coun-
try, a practice never before attempted by this country in
time of peace.   The seizure of hovering vessels beyond
territorial waters rests upon the acquiescence of the sov-
ereign whose flag is thus violated, and is not a matter
of right.   Fish, Secretary of State, to Thornton, January
22, 1875; Moore's Digest Int. Law, 731; Buchanan, Sec-
retary of State, to Crampton, August 19, 1848; Evarts,
Secretary of State, to Fairchild, March 3, 1881; 1 Moore
732; *Cunard S. S. Co.* v. *Mellon,* 262 U. S. 100.   In a
group of early cases in this Court the subject of seizure
beyond the three-mile limit was discussed.   *Church* v.
*Hubbart,* 2 Cr. 187; *Rose* v. *Himely,* 4 Cr. 241; *Hudson*
v. *Guestier,* 6 Cr. 281.   See Wheaton, Int. L. 8th ed.,
§ 179; 1 Moore 727.   One thing alone appears clearly—
the exercise of authority beyond the three-mile limit
depends upon its acceptance by other nations, in each
instance, as reasonable under the conditions.   There has
been nothing more provocative of international friction
than searches and seizures by one nation of the vessels of
another nation on the high seas.

Up to the time of the decision of the cases arising
in connection with the enforcement of the national pro-
hibition of intoxicating liquors, there is no case of the
seizure and forfeiture of a foreign vessel in time of peace

which had never itself or through its boats come within the territorial waters of the United States, except in the fur seal controversy, and for these seizures the United States paid compensation. *Cunard* v. *Mellon,* 262 U. S. 100; *The Grace and Ruby,* 283 Fed. 475; *The Henry L. Marshall,* 286 Fed. 260. In 1922 the United States began to make seizures beyond the three-mile limit which action evoked protests from Great Britain. The treaty of May 22, 1924, was made to settle in a complete way all questions involving the interference with British vessels beyond territorial waters. 43 Stat. 1761. It granted the right to seize British vessels in certain areas beyond territorial waters for the sole and limited purpose of adjudicating the vessel only in accordance with the laws of the United States prohibiting the importation of alcoholic beverages.

The rules of construction of treaties are the same as those relating to simple contracts. *United States* v. *Choctaw Nation,* 179 U. S. 494, and cases therein cited. Every consideration which may affect construction of the treaty supports the conclusion that Great Britain granted no right to subject to criminal prosecution British subjects brought into the United States as an incident of a seizure under the treaty. *The Sagatind,* 11 Fed. (2d) 673; *Hennings* v. *United States,* 13 Fed. (2d) 74; *The Marjorie E. Bachman,* 4 Fed. (2d) 405. The end sought to be accomplished by the treaty was not the apprehension and punishment of criminals. It was the seizure and forfeiture of hovering vessels used in introducing alcoholic liquors into the United States. By such seizure and forfeiture the United States was seeking to clear its coasts of these vessels and sought the coöperation of Great Britain in extending the area in which it might seize these vessels for the purpose of forfeiting them. So far as appears, nothing more was asked and certainly nothing more was granted.

The defendants, having been brought within the jurisdiction of the United States by virtue of the treaty, may not be proceeded against in a manner not permitted by it. *Foster* v. *Neilson,* 2 Pet. 253. So clear is the treaty as to the rights of British subjects upon the high seas that it has been made the basis of decision in the federal courts. *The Frances Louise,* 1 Fed. (2d) 1004; *The Marjorie E. Bachman,* 4 Fed. (2d) 405; *The Over The Top,* 5 Fed. (2d) 838; *The Pictonian,* 3 Fed. (2d) 145; *The Sagatind,* 11 Fed. (2d) 673; *Hennings* v. *United States,* 13 Fed. (2d) 74. If British subjects, brought into an American port as an incident to the seizure of a British vessel for purposes of adjudicating it under the laws prohibiting the importation of alcoholic liquors, can be indicted and convicted for conspiracy to violate the National Prohibition Act and the Tariff Act they can be similarly dealt with for any offense against American laws, even though, as in case of such a conspiracy, it is not an offence mentioned in the treaty of May 22, 1924, or in the extradition treaty. Such a result could hardly be regarded by Great Britain other than as—" a fraud upon the rights of the parties and bad faith toward the country which permitted the seizure." *United States* v. *Rauscher,* 119 U. S. 407.

The grand jury regarded the treaty as providing the essence of the charge against these defendants. No evidence was adduced at the trial and presumably not before the grand jury that these men had ever come within the generally recognized territorial jurisdiction of the United States. So important did the grand jury regard the treaty in making unlawful the conduct charged against the defendants that in alleging two of the four overt acts it used the exact language of the treaty to place the acts as taking place within the distance from the coast of the United States which the *Quadra* and the motor boats in question could traverse in one hour.

The Circuit Court of Appeals sustained the indictment and conviction by rejecting as surplusage the references to the treaty in the charging paragraphs which made the indictment fatally defective. This was done not only after the grand jury had presented these defendants for trial, but after the trial jury had found them guilty of a conspiracy as alleged in the indictment. This the Court had no power to do. *Joplin Mercantile Co.* v. *United States,* 236 U. S. 531; *Ex parte Bain,* 121 U. S. 1; *Dodge* v. *United States,* 258 Fed. 300; *Stewart* v. *United States,* 12 Fed. (2d) 524; *United States* v. *Howard,* 132 Fed. 325; *Naftsger* v. *United States,* 200 Fed. 494.

Section 37 of the Criminal Code is not operative against British subjects upon a British vessel on the high seas. *Cunard S. S. Co.* v. *Mellon,* 262 U. S. 100. The words of § 37 apparently having universal scope must be " taken as a matter of course to mean only everyone subject to such legislation, not all that the legislator subsequently may be able to catch." Viewed in this light it will hardly be contended that § 37 is to be construed as generally applicable. From whatever angle the present question is approached the problem always remains whether § 37 shall be interpreted, as this Court has declared that all criminal statutes should be interpreted, in accordance with recognized international law. *United States* v. *Bowman,* 260 U. S. 94; *Hyde* v. *United States,* 225 U. S. 347.

*Solicitor General Mitchell,* with whom *Assistant Attorney General Willebrandt* and *Mr. John J. Byrne,* Attorney in the Department of Justice, were on the brief, for the United States.

The seizure of the *Quadra* was within the terms of the treaty because the circumstances at the time gave reasonable cause for belief that the vessel and those on board had committed or were committing or attempting to commit an offense against the laws of the United States pro-

hibiting the importation of alcoholic beverages, and there was evidence to sustain the finding that a boat intended to convey liquor to shore could traverse the distance to shore within an hour and that the seizure was within the limit of distance fixed by the treaty. *Grace and Ruby,* 283 Fed. 476; *Henry L. Marshall,* 292 Fed. 486.

The treaty contemplates that the vessel, her cargo, and those on board shall be brought into port. When that is done, if it appears that the persons on board have committed an offense, they may be prosecuted therefor. The treaty does not, by its terms, provide that the crew or cargo must be released, and no such stipulation is implied. The implication is to the contrary, and the attempt to establish an analogy between this case and extradition cases fails. There is nothing in the treaty to sustain the claim that the crew may not be tried for any offense, and the treaty should not be narrowly construed only to permit their trial for violation of the substantive offense of introduction of liquors, but not for conspiracy to do so. The treaty should be construed to carry out its purposes and to relate to violations of law on the subject of alcoholic beverages. *United States* v. *Rauscher,* 119 U. S. 407; *Ker* v. *Illinois,* 119 U. S. 436.

Although the officers of the vessel did not physically come within the territorial limits of the United States, they were parties to the conspiracy to commit crime within the United States made by them with those within the United States, and they directly aided, abetted and combined with those within our jurisdiction in the commission of overt acts within the United States and are therefore subject to trial and punishment under our laws. *United States* v. *Davis,* 2 Sumn. 482; *In re Palliser,* 136 U. S. 257; *Horner* v. *United States,* 143 U. S. 207; *Benson* v. *Henkel,* 198 U. S. 1; *Commonwealth* v. *Macloon,* 101 Mass. 1; *People* v. *Adams,* 3 Denio 190; *McLoughlin* v.

*Raphael Truck Co.*, 191 U. S. 267; *Reg.* v. *Garrett*, 1 Dearsly 232.

The statement in the indictment that the defendants conspired to unlawfully introduce liquor into the United States in violation of the treaty may be treated as surplusage.

Mr. Chief Justice Taft delivered the opinion of the Court.

This is a review by certiorari of the conviction of George Ford, George Harris, J. Evelyn, Charles H. Belanger and Vincent Quartararo, of a conspiracy, contrary to § 37 of the Criminal Code, to violate the National Prohibition Act, Title II, §§ 3 and 29, c. 85, 41 Stat. 305, 308, 316, and the Tariff Act of 1922, § 593 (b), c. 356, 42 Stat. 858, 982. The trial and conviction resulted largely from the seizure of the British vessel Quadra, hovering in the high seas off the Farallon Islands, territory of the United States, twenty-five miles west from San Francisco. The ship, her officers, her crew and cargo of liquor were towed into the port of San Francisco. The seizure was made under the authority of the treaty between Great Britain and the United States, proclaimed by the President May 22, 1924, 43 Stat. 1761, as a convention to aid in the prevention of the smuggling of intoxicating liquors into the United States.

The main questions presented are, first, whether the seizure of the vessel was in accordance with the treaty; second, whether the treaty prohibits prosecution of the persons, subjects of Great Britain, on board the seized vessel brought within the jurisdiction of the United States upon the landing of such vessel, for illegal importation of liquor; third, whether the treaty authorizes prosecution of such persons, not only for the substantive offense of illegal importation or attempt to import, but also for conspiracy to effect it; and, fourth, whether such persons,

without the United States, conspiring and coöperating to violate its laws with other persons who are within the United States and to commit overt acts therein, can be prosecuted therefor when thereafter found in the United States.

The petitioners and fifty-five others were indicted in November, 1924, for carrying on a continuous conspiracy at the Bay of San Francisco, in the jurisdiction of the United States, from January 1, 1924 to November of that year, the date of the indictment, to commit offenses against the laws of the United States, first, by introducing into and transporting in the United States intoxicating liquor, in violation of the National Prohibition Act; second, by importing liquor into the United States, in violation of § 593, sub-division (b), of the Tariff Act of 1922, making it a penal offense to introduce merchandise into the United States in violation of law; and, third, by violation of the terms of the treaty. It charged as overt acts: the loading of 12,000 cases of liquor on the Quadra at Vancouver, British Columbia, her proceeding on September 10, 1924, to a point less than twelve miles from the Farallon Islands,—a distance which could be traversed in less than an hour by the Quadra and by the motor boats, 903 B, C–55, Marconi, California, Ocean Queen and divers others, by which the liquor was then delivered from her and imported into the United States; that on the 29th of September, 1924, the defendants landed from the steamer Quadra a barrel containing 100 gallons of whiskey, and, at another time, on October 11, 1924, a large variety of alcohol, gin, brandy, whiskey, and vermouth; and that, at another time, on October 12th, the day of the seizure, they attempted to land 89 sacks of whiskey, but that two of the defendants, who were on the small craft C–55, were arrested and were prevented from carrying out their purpose. Two defendants pleaded guilty. Of twenty-nine defendants tried, nineteen, including all the crew of

the Quadra were acquitted, and ten, including the captain and the first and second officers of the Quadra, were convicted. Of these ten, five, including the three officers, are now before the Court as petitioners. The convictions were affirmed by the Circuit Court of Appeals of the Ninth Circuit. 10 Fed. (2d) 339.

The validity of the indictment is attacked, first, because it charges that the conspiracy was to violate the treaty, although the treaty creates no offense against the law of the United States. This is true, but that part of the indictment is merely surplusage and may be rejected. *Bailey* v. *United States*, 5 F. (2d) 437; *Remus* v. *United States*, 291 Fed. 501; *United States* v. *Weiss*, 293 Fed. 992, 995; *United States* v. *Drawdy*, 288 Fed. 567, 570. The trial court took this view. But it is contended that this is to amend the indictment and comes within the inhibition of the principle of *Ex parte Bain*, 121 U. S. 1. That decision condemns the striking out of words from an indictment. The action here complained of is merely a judicial holding that a useless averment is innocuous and may be ignored. *Goto* v. *Lane*, 265 U. S. 393, 402; *Salinger* v. *United States*, 272 U. S. 542. Next it is said that the indictment is bad for duplicity. It charges a continuous conspiracy by the defendants, at the Bay of San Francisco, between January 1, 1924, and the date of finding the indictment, to import into the United States intoxicating liquor in violation of its laws. It mentions two of such laws, and, as § 37 of the Criminal Code requires, it describes several overt acts in pursuance of the conspiracy alleged. The charge is unitary in relating to one continuous conspiracy, although in proof of it different circumstances constituting it and overt acts in pursuance of it are disclosed. This does not constitute duplicity. *Frohwerk* v. *United States*, 249 U. S. 204, 210; *Joplin Co.* v. *United States*, 236 U. S. 531, 548.

The case on the evidence made by the Government was as follows:

On October 12, 1924, the United States Coast Guard cutter Shawnee, on the lookout for vessels engaged in the illicit importation into the United States of intoxicating liquor, saw the Quadra, a British steamer of Canadian register, near the Farallon Islands. As the Shawnee bore down on her to investigate, she turned and began to move off shore. The captain of the Shawnee signalled her to stop, and she complied. As the Shawnee approached her, a motor boat, C-55, was seen just after the boat had left the Quadra. The Shawnee captain signalled the boat to stop, and because it did not do so, fired a shot across its bow, whereupon it rounded about and came alongside. It had two men and a number of sacks of intoxicating liquor, as well as a partly filled case of beer bottles. It was made fast to the Shawnee and the two men were placed under arrest. The Shawnee captain then sent two officers aboard the Quadra to examine her papers. Ford, her captain, one of the convicted defendants, refused to show his papers or to give any information until he had consulted counsel. The Shawnee officers then took charge of her. She was found to contain a large quantity of intoxicating liquor, and on refusal of Ford to take her by steam into San Francisco, the Shawnee towed her to that port and turned her cargo over to the United States customs officers, while her officers and crew, including Ford, were arrested.

The testimony for the Government tended to show that the Quadra when seized was 5.7 nautical miles from the Farallon Islands, and that the motor boat C-55 could have traversed that distance in less than an hour.

The evidence for the Government at the trial further showed there were three vessels, the Quadra, the Malahat, and the Coal Harbour, chartered by a cargo-owning cor-

poration called the Consolidated Exporters Corporation, Limited, of Canada, and loaded at Vancouver, British Columbia, with large cargoes of miscellaneous liquors; that the Malahat left Vancouver in May officially destined to Buenaventura, Colombia; that the Coal Harbour left the same port in July with a similar cargo officially destined to La Libertad, San Salvador; and that the Quadra left there in September, officially destined to La Libertad. The captains of these vessels, while hovering near the Farallones, were constantly in touch with the convicted defendants Quartararo and Belanger, at San Francisco, and acted to some extent under their orders and directions. Quartararo was the most active agent of the conspiracy on shore. Belanger was a director of the Canadian corporation above named. He arranged for and had sent from San Francisco to the Malahat burlap containers to be used for landing the bottled liquor, thence to be transferred to the Quadra, and also gave the orders to transfer liquor from one vessel to another, and to bring designated liquor from the vessels' cargoes to the shore. The Quadra was supplied with fuel oil from the shore, pursuant to prearrangement. None of the sea-going vessels above named proceeded to their destinations officially described in their ship's papers, but they cruised up and down between the Farallones and the Golden Gate, where the exchanges of liquor and sacks were made and where the needed oil was delivered, and from where the liquor was carried by small boats to a landing place called Oakland Creek, in San Francisco. The evidence of the conspiracy, the landing of the liquor and the complicity of the convicted defendants therein was ample and practically undenied.

There was a preliminary motion to exclude and suppress the evidence of the ship and cargo. It was contended that the seizure was unlawful because not within the zone of the high seas prescribed by the treaty; and that the officers of the Quadra being prosecuted were protected

against its use as evidence against them under the Fourth and Fifth Amendments to the Federal Constitution. The motion was heard by the District Court without a jury and was denied in an opinion reported in 3 Fed. (2d) 643. The evidence of the Government showed that the Quadra was seized at a distance from the Farallon Islands of 5.7 miles, and a test made later of the speed of the motor boat C–55, caught carrying liquor from her, showed that it could traverse 6.6 miles in an hour. There was a conflict as to the exact position of the Quadra at the time of the seizure. It was further objected that the speed of the motor boat was not made under the same conditions as those which existed at the time of the seizure.

The question of the evidential weight of the test as well as of all the circumstances was for the judgment of the trial court. As it has been affirmed by the Circuit Court of Appeals, we see no reason to reverse it.

It is objected that the question of the validity of the seizure should have been submitted to the jury. So far as the objection relates to the admission of evidence, it has already been settled by this Court that the question is for the court and not for the jury. *Steele* v. *United States*, 267 U. S. 505, 511; *Gila Valley Railway Company* v. *Hall*, 232 U. S. 94, 103; *Bartlett* v. *Smith*, 11 M. & W. 483; *Doe dem. Jenkins* v. *Davies*, 10 Ad. & El. N. S. 314; *Cleave* v. *Jones*, 7 Exchequer 421, 425; Wigmore on Evidence, (2nd ed.) vol. V., p. 556, § 2550.

It is further objected, however, that the issue as to the place of the seizure, though submitted to and disposed of by the court in respect of the admissibility of evidence, should also have been submitted to the jury on the general issue. The Solicitor General answers, on the authority of *Ker* v. *Illinois*, 119 U. S. 436, that an illegal seizure would not have ousted the jurisdiction of the court to try the defendants. But the *Ker* case does not apply here. It related to a trial in a state court, and this Court found

that the illegal seizure of the defendant therein violated neither the Federal Constitution, nor a federal law, nor a treaty of the United States, and so that the validity of their trial after alleged seizure was not a matter of federal cognizance. Here a treaty of the United States is directly involved, and the question is quite different.

But there is a reason why this assignment of error can not prevail. The issue whether the ship was seized within the prescribed limit did not affect the question of the defendants' guilt or innocence. It only affected the right of the court to hold their persons for trial. It was necessarily preliminary to that trial. The proper way of raising the issue of fact of the place of seizure was by a plea to the jurisdiction. A plea to the jurisdiction must precede the plea of not guilty. Such a plea was not filed. The effect of the failure to file it was to waive the question of the jurisdiction of the persons of defendants. *Dowdell* v. *United States,* 221 U. S. 325, 332; *Albrecht* v. *United States,* 273 U. S. 1; *Gardner* v. *United States,* 5 Indian Territory 150, 156; *Regina* v. *Stone,* 23 Ontario 46, 50; *In re Paul,* 5 Alberta Law 442; *State* v. *Bishop,* 7 Conn. 181; *State* v. *Watson,* 20 R. I. 354; *State* v. *Kinney,* 41 Iowa 424; *In re Roszcynialla,* 99 Wis. 534, 538; *State ex rel. Brown* v. *Fitzgerald,* 51 Minn. 534; *In re Brown,* 62 Kan. 648; *State* v. *Browning,* 70 S. Car. 466; *Hollibaugh* v. *Hehn,* 13 Wyo. 269; *In re Blum,* 9 N. Y. Misc. 571; 1 Bishop Crim. Proc. (2d ed.) §§ 730, 744 and 746; 1 Chitty Criminal Law (5th Am. ed.) p. 438. It was not error therefore to refuse to submit to the jury on the trial the issue as to the place of the seizure.

There was a demurrer to the indictment, on the grounds that it did not state facts sufficient to constitute an offense against the United States, that the court had no jurisdiction to try those who were on the Quadra because seized beyond the three-mile limit, and that the acts charged were not within the jurisdiction of the court. The con-

spiracy was laid at the Bay of San Francisco, which was within the jurisdiction of the court. The conspiracy charged was undoubtedly a conspiracy to violate the laws of the United States under § 37 of the Criminal Code. The court had jurisdiction to try the offense charged in the indictment and the defendants were in its jurisdiction because they were actually in its custody.

The defendants contend that on the face of the indictment and the treaty they are made immune from trial. This requires an examination and construction of the treaty.

The preamble of the treaty recites that the two nations, being desirous of avoiding any difficulties which might arise between them in connection with the laws in force in the United States on the subject of alcoholic beverages, have decided to conclude a convention for the purpose. The first four Articles are as follows:

"ARTICLE I.

" The High Contracting Parties declare that it is their firm intention to uphold the principle that 3 marine miles extending from the coast-line outwards and measured from low-water mark constitute the proper limits of territorial waters.

"ARTICLE II.

"(1) His Britannic Majesty agrees that he will raise no objection to the boarding of private vessels under the British flag outside the limits of territorial waters by the authorities of the United States, its territories or possessions in order that enquiries may be addressed to those on board and an examination be made of the ship's papers for the purpose of ascertaining whether the vessel or those on board are endeavoring to import or have imported alcoholic beverages into the United States, its territories or possessions in violation of the laws there in force.

When such enquiries and examination show a reasonable ground for suspicion, a search of the vessel may be instituted.

"(2) If there is reasonable cause for belief that the vessel has committed or is committing or attempting to commit an offense against the laws of the United States, its territories or possessions prohibiting the importation of alcoholic beverages, the vessel may be seized and taken into a port of the United States, its territories or possessions for adjudication in accordance with such laws.

"(3) The rights conferred by this article shall not be exercised at a greater distance from the coast of the United States its territories or possessions than can be traversed in one hour by the vessel suspected of endeavoring to commit the offense. In cases, however, in which the liquor is intended to be conveyed to the United States its territories or possessions by a vessel other than the one boarded and searched, it shall be the speed of such other vessel and not the speed of the vessel boarded, which shall determine the distance from the coast at which the right under this article can be exercised.

## "ARTICLE III.

" No penalty or forfeiture under the laws of the United States shall be applicable or attach to alcoholic liquors or to vessels or persons by reason of the carriage of such liquors, when such liquors are listed as sea stores or cargo destined for a port foreign to the United States, its territories or possessions on board British vessels voyaging to or from ports of the United States, or its territories or possessions or passing through the territorial waters thereof, and such carriage shall be as now provided by law with respect to the transit of such liquors through the Panama Canal, provided that such liquors shall be kept under seal continuously while the vessel on which they are carried remains within said territorial waters and that

no part of such liquors shall at any time or place be unladen within the United States, its territories or possessions.

## "ARTICLE IV.

"Any claim by a British vessel for compensation on the grounds that it has suffered loss or injury through the improper or unreasonable exercise of the rights conferred by Article II of this Treaty or on the ground that it has not been given the benefit of Article III shall be referred for the joint consideration of two persons, one of whom shall be nominated by each of the High Contracting Parties.

" Effect shall be given to the recommendations contained in any such joint report. If no joint report can be agreed upon, the claim shall be referred to the Claims Commission established under the provisions of the Agreement for the Settlement of Outstanding Pecuniary Claims signed at Washington the 18th August, 1910, but the claim shall not, before submission to the tribunal, require to be included in a schedule of claims confirmed in the manner therein provided."

The other two articles relate only to duration and ratification.

The treaty indicates a considerate purpose on the part of Great Britain to discourage her merchant ships from taking part in the illicit importation of liquor into the United States, and the further purpose of securing without objection or seizure the transportation on her vessels, through the waters and in ports of the United States, of sealed sea stores and sealed cargoes of liquor for delivery at other destinations than the United States. The counter-consideration moving to the United States is the enlargement and a definite fixing of the zone of legitimate seizure of hovering British vessels seeking to defeat the laws against importation of liquor into this country from

42847°—27——39

the sea. The treaty did not change the territorial jurisdiction of the United States to try offenses against its importation laws. That remained exactly as it was. If the ship could not have been condemned for such offenses before the treaty, it can not be condemned now. If the persons on board could not have been convicted before the treaty, they can not be convicted now. The treaty provides for the disposition of the vessel after seizure. It has to be taken into port for adjudication. What is to be adjudicated? The vessel. What does that include? The inference that both ship and those on board are to be subjected to prosecution on incriminating evidence is fully justified by paragraph 1 of Article II, in specifically permitting examination of the ship papers and inquiries to those on board to ascertain whether, not only the ship, but also those on board, are endeavoring to import, or have imported, liquor into the United States. If those on board are to be excluded, then by the same narrow construction the cargo of liquor is to escape adjudication, though it is subject to search as the persons on board are to inquiry into their guilt. It is no straining of the language of the article therefore to interpret the phrase " the vessel may be seized and taken into a port of the United States  .  .  . for adjudication in accordance with such laws," as intending that not only the vessel but that all and everything on board are to be adjudicated. The seizure and the taking into port necessarily include the cargo and persons on board. They can not be set adrift or thrown overboard. They must go with the ship—they are identified with it. Their immunity on the high seas from seizure or being taken into port came from the immunity of the vessel by reason of her British nationality. When the vessel lost this immunity, they lost it too, and when they were brought into a port of the United States and into the jurisdiction of its District Court, they were just as much subject to its

adjudication as the ship. If they committed an offense against the United States and its liquor importation laws, they can not escape conviction, unless the treaty affirmatively confers on them immunity from prosecution. There certainly are no express words granting such immunity. Why should it be implied? If it was intended by the parties why should it not have been expressed?

It is urged that the principle of interpretation, *Expressio unius est exclusio alterius,* requires the implication from the reference to the adjudication of the vessel alone. This maxim properly applies only when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference that that which is omitted must be intended to have opposite and contrary treatment. But here, as we have already pointed out, the obvious and necessary association of the seizure and the taking to port of the cargo and those on board with that of the vessel naturally carries the same association with the step of adjudication. This destroys the idea of contrast so that the inference based on the maxim can not here be drawn. The ship, on the one hand, and those on her and her cargo, on the other, are not, in the natural reading of the words, set over against each other. The words " for adjudication " are arranged as incidental to the seizure and taking into port, in which the persons on board and the cargo must be included. Why then should they be excluded from the last of the three steps described in the disposition of the vessel?

The maxim of interpretation relied on is often helpful, but its wise application varies with the circumstances. *United States* v. *Barnes,* 222 U. S. 513, 518-519; *City of New York* v. *Davis,* 7 F. (2d) 566, 575; *Saunders* v. *Evans,* 8 H. L. C. 721, 729; *London Joint Stock Bank* v. *Mayor,* 1 C. P. D. 1, 17; *Colquhoun* v. *Brooks,* 21 Q.

B. D. 52, 65. Broom's Legal Maxims, 7th Ed., p. 653, says:

" It will, however, be proper to observe, before proceeding to give instances in illustration of the maxim, *Expressio unius est exclusio alterius,* that great caution is requisite in dealing with it for, as Lord Campbell observed in *Saunders* v. *Evans,* it is not of universal application, but depends upon the intention of the party as discoverable upon the face of the instrument or of the transaction; thus where general words are used in a written instrument, it is necessary, in the first instance, to determine whether those general words are intended to include other matters besides such as are specifically mentioned, or to be referable exclusively to them, in which latter case only can the above maxim be properly applied."

Lord Justice Lopes says of the maxim in *Colquhoun* v. *Brooks, supra:*

" It is often a valuable servant, but a dangerous master to follow in the construction of statutes or documents. The *exclusio* is often the result of inadvertence or accident, and the maxim ought not to be applied, when its application, having regard to the subject-matter to which it is to be applied, leads to inconsistency or injustice."

What reason could Great Britain have for a stipulation clothing with immunity either contraband liquor which should be condemned or the guilty persons aboard, when the very object of the treaty was to help the United States in its effort to protect itself against such liquor and such persons, from invasion by the sea? To give immunity to the cargo and the guilty persons on board would be to clear those whose guilt should condemn the vessel and to restore to them the liquor, and thus release both for another opportunity to flout the laws of a friendly government which it was the purpose of the

treaty to discourage. The owner of the vessel would thus alone be subjected· to penalty, and he would suffer for the primary guilt of the immunized owner of the liquor. Such implication of immunity leads to inconsistency and injustice. The palpable incongruity contended for is such that, without express words, we can not attribute to the high contracting parties. intention to bring it about.

· Nor have we been advised that Great Britain has ever suggested that under this treaty a crew of a vessel lawfully seized could not be brought into port or tried according to our laws.. Diligent as the representatives of that nation have always been in guarding the rights of their people, such a construction of ·the treaty has not been advanced. It is said by the Solicitor General without contradiction that, following a number of seizures of British ships on our coasts under the treaty, those on board have been indicted and tried for offenses against the laws relating to intoxicating beverages, and that the State Department records show no objection of immunity therefrom to have been claimed for them by the British Government. One instance cited is in respect of the crew of the British schooner Francis E., which was seized off the coast of Alabama, and whose master and crew were arrested and indicted and subsequently tried and convicted for conspiracy to smuggle intoxicating liquors into the United States. Under date of June 30, 1925, pending the trial, the British Embassy communicated to the Secretary of State a complaint, as follows:

"As you are doubtless aware, the British schooner Frances E of Nassau was seized by a United States revenue cutter on April 24th last and was later escorted into the port of Mobile, Alabama, where her master and crew were arrested and charged with conspiracy to violate the National Prohibition laws.

" I am informed that the defendants in this case have now been incarcerated in gaol since April 28th last and are

still awaiting trial and that the long delay, added to their uncertainty as to the future, is causing them considerable suffering."

The request was then made that the trial be expedited, and this was followed by a similar request in October, 1925; but there was no claim that any immunity from trial was secured by the treaty to those who were brought in on the vessel seized.

The case of the *United States v. Rauscher*, 119 U. S. 407, is relied on to establish the immunity contended for in this case. Rauscher was convicted under an indictment in a federal court for cruel and unusual punishment of one of the crew of an American vessel of which Rauscher was an officer. He had been extradited from British territory for murder on the high seas under § 4339 of the Revised Statutes. The question was whether he could be tried in this country for another offense than that for which he was extradited,—for an offense for which the treaty granted no right to extradition. The extradition treaty was that of August 9, 1842, between Great Britain and the United States, 8 Stat. 576, in which each country, upon mutual requisition of the other, agreed to deliver to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, should seek an asylum or should be found, within the territories of the other: provided, that this should only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged should be found, would justify his apprehension and commitment for trial, if the crime or offense had there been committed; and the respective judges and other magistrates of the two Governments were given jurisdiction upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged,

that he might be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality might be heard and considered; and if, on such hearing, the evidence were deemed sufficient to sustain the charge, it should be the duty of the examining judge or magistrate to certify the same to the proper executive authority, that a warrant might issue for the surrender of such fugitive. The court held that a defendant thus extradited could not be tried for any offense other than the one for which he was extradited. The case was decided at the end of a prolonged controversy between Great Britain and the United States through their State Departments on the same issue presented in several cases.

The opinion of the Court was delivered by Mr. Justice Miller, and his conclusions were based, first, on the ground that, according to the doctrine of publicists and writers on international law, the country receiving the offender against its laws from another country in the absence of treaty has no right to proceed against him for any other offense than that for which he had been delivered up; second, that the enumeration of the offenses in the treaty there involved marked such a clear line in regard to the magnitude and importance of those offenses that it was impossible to give any other interpretation to it than the exclusion of the right of extradition in others; third, the provisions of the treaty giving a party an examination before a judicial tribunal in which, before he should be delivered up, the offense for which he was to be extradited must be proved to the satisfaction of the tribunal, left no doubt that the purpose of the treaty was that the person delivered up should be tried for that offense and no other; and fourth, that the provisions of §§ 5272 and 5275 of the Revised Statutes required such course in the trial of extradited persons.

This review of the opinion in the *Rauscher* case shows that it affords no support for the implication of immunity

of the smugglers or would-be smugglers, or the contraband cargo, in the case before us. If it were attempted to try the defendants or to forfeit the cargo that was brought into port, for smuggling of forbidden opium, a different question might possibly be presented. But here the subjecting of the defendants and the cargo, by the seizure of the vessel, to the jurisdiction of the courts of the United States is for a conspiracy to do the smuggling of liquor which was the ground for the vessel's seizure. This destroys any real analogy between the *Rauscher* case and this. More than this, the strength of the provisions of the treaty in the *Rauscher* case, as detailed in the opinion, to establish the sound application of the *exclusio* maxim of interpretation, shows how weak by contrast is its application to the circumstances of this case.

It is next objected that the convicted defendants taken from the Quadra were not triable under the indictment, because it charges an offense against them for which under the treaty neither they nor the Quadra could have been seized in the prescribed limit. It is very doubtful whether the objection was made in time and was not waived by the plea of not guilty; but we shall treat it as having been duly made. The contention of counsel on this point is that the treaty permits seizure only for the substantive offense of importing, or attempting to import, liquor illegally, and not for a conspiracy to do so.

These defendants were indicted under § 37 of the Criminal Code of the United States for having conspired at the Bay of San Francisco to violate the National Prohibition Act and the Tariff Act of 1922. Section 37 of the Criminal Code provides that if two or more persons conspire to commit an offense against the United States, and one or more of such parties commit any act to effect the object of the conspiracy, each shall be punished.

The National Prohibition Act, c. 85, § 3, 41 Stat. 305, 308, enacted October 29, 1919, provides:

"No person shall on or after the date when the 18th Amendment to the Constitution goes into effect, manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor except as authorized in this Act, and all the provisions of this Act shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented."

The Tariff Act of September 21, 1922, 42 Stat., c. 356, § 593 (b) provides that if any person fraudulently or knowingly imports or brings into the United States, or assists in doing so, any merchandise contrary to law, he shall be fined or imprisoned. The importation of liquor into the United States is contrary to law, as shown by the Prohibition Act.

The indictment charged as overts acts that the defendants and each of them on the 10th and 29th of September, and October 11th, by small boats from the Quadra landed illegally in San Francisco substantial quantities of liquor, and on the 12th of October, the day of the seizure, attempted to land another lot of liquor but were defeated by the seizure.

The preamble of the treaty recites that the two nations, being desirous of avoiding any difficulties which might arise between them in connection with the laws in force in the United States on the subject of alcoholic beverages, have decided to conclude a convention for the purpose. Paragraph (1) of Article II provides for boarding, examination and search to ascertain whether the ship or those on board were "endeavoring to import or have imported alcoholic beverages into the United States in violation of the laws there in force." The second paragraph of Article II permits the seizure on belief that "the vessel has committed or is committing or is attempting to commit

an offense against the laws of the United States prohibit-
ing the importation of alcoholic beverages."

Considering the friendly purpose of both countries in
making this treaty, we do not think any narrow construc-
tion should be given which would defeat it. The parties
were dealing with a situation well understood by both.
In effect they wished to enable the United States better
to police its seaboard by enabling it, within an hour's sail
from its coast, beyond its territorial jurisdiction and on
the high seas, to seize British actual or would-be smugglers
of liquor and, if they were caught, to proceed criminally
against them as if seized within the three-mile limit for
the same offenses, in reference to liquor importation. No
particular laws by title or date were referred to in the
treaty but only the purpose and effect of them. Plainly,
it was the purpose of the contracting parties that vessels
and men who are caught under the treaty and are proven
to have violated any laws of the United States, by which
the importation of liquor is intended to be stopped
through forfeiture or punishment, may be prosecuted
after the seizure. The National Prohibition Act expressly
punishes the importation of intoxicating liquor. The
Tariff Act of 1922 declares it an offense to make any
illegal importation, and so makes it an offense to import
intoxicating liquor. Section 37 of the Criminal Code
makes it an offense to conspire to violate the Prohibition
Act and the Tariff Act in respect of the importation of
liquor, if the conspiracy is accompanied by overt acts in
pursuance of it. The conspiracy act is the one most
frequently used in the prosecution of liquor importations
from the sea, because such smuggling usually necessitates
a conspiracy in preparation for the landing. We think
that any more limited construction would not satisfy the
reasonable expectations of the two parties. Nothing in
the words of the treaty makes such an interpretation a
difficult one. The penalties under each act differ from

those under the others. The Tariff Act and the conspiracy section each imposes a maximum penalty of two years, while that of the Prohibition Act is only six months, with a lower maximum of fine. The differences are clearly not sufficient to affect the construction. The substantive offense of importing liquor is in law a different one from the preparatory offense of conspiring to import liquor; but where, as here, the overt acts of the conspiracy include an actual importation of liquor and an attempt, it would seem to be quite absurd to hold that the conspiracy set forth does not come within the scope of the treaty. This is not a case for keeping within the technical description of a particular offense. It is not a formal extradition treaty where it is necessary, in protection of the persons to be extradited and carried from one country to another, that the crime for which they are to be tried should be described with nicety and precision to permit the operation of the principles recognized and enforced in the *Rauscher* case. Any law, the enforcement of and punishment under which will specifically prevent smuggling of liquor, should be regarded as embraced by the treaty. The British Government has advanced no contrary view. In the letter from the British Embassy, of June 30, 1925, already referred to, the fact that the master and crew of the British schooner Francis E. of Nassau, were arrested and charged with conspiracy to violate the National Prohibition laws, was not made the basis of complaint or protest but only of a request that the trial be expedited. The error assigned upon this point can not be sustained.

The next objection of the defendants taken from the Quadra is that on all the evidence they were entitled to a directed verdict of not guilty. They argue that they are charged with a conspiracy illegally to import, or to attempt to import, liquor into the United States when they were corporeally at all times during the alleged conspiracy out of the jurisdiction of the United States and

so could commit no offense against it. What they are charged with is conspiring " at the bay of San Francisco " with the defendants Quartararo and Belanger illegally to import liquor, and the overt acts of thus smuggling and attempting to smuggle it. The conspiracy was continuously in operation between the defendants in the United States and those on the high seas adjacent thereto, and of the four overt acts committed in pursuance thereof, three were completed and took effect within the United States and the fourth failed of its effect only by reason of the intervention of the federal officers. In other words, the conspiring was directed to violation of the United States law within the United States by men within and without it, and everything done was at the procuration and by the agency of each for the other in pursuance of the conspiracy and the intended illegal importation. In such a case all are guilty of the offense of conspiring to violate the United States law whether they are in or out of the country.

In *Strassheim* v. *Daily*, 221 U. S. 280, Daily had been convicted of procuring Armstrong, a public official of Michigan, to pay bills presented to the State which Armstrong knew to be fraudulent. It was objected that, during the whole period of the crime, Daily was in Chicago, Illinois, and could not be punished under an indictment found in Michigan for such an offense. This Court denied the claim, saying (pp. 284, 285):

"If a jury should believe the evidence and find that Daily did the acts that led Armstrong to betray his trust, deceived the Board of Control, and induced by fraud the payment by the State, the usage of the civilized world would warrant Michigan in punishing him, although he never had set foot in the State until after the fraud was complete. Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if

he had been present at the effect, if the State should succeed in getting him within its power. *Commonwealth* v. *Smith,* 11 Allen 243, 256, 259; *Simpson* v. *State,* 92 Georgia 41; *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, 356; *Commonwealth* v. *Macloon,* 101 Mass. 1, 6, 18. We may assume therefore that Daily is a criminal under the laws of Michigan."

Other cases in this Court which sustain the same view are *Benson* v. *Henkel,* 198 U. S. 1; *Re Palliser,* 136 U. S. 257; *Horner* v. *United States,* 143 U. S. 207; *Burton* v. *United States,* 202 U. S. 344, 387; and *Lamar* v. *United States,* 240 U. S. 60, 65, 66.

There has been much discussion of this general principle, and its application has been varied in some courts because of certain rules of the common law with respect to principals and accessories; but in the consideration of such a case as this, we are not controlled by such considerations and regard the principle as settled, as in the passage quoted. It is supported by other authorities: *Commonwealth* v. *Gillespie,* 7 Sargent & Rawle 469, 478; *Rex* v. *Brisac and Scott,* 4 East, 164; *State* v. *Piver,* 74 Wash. 96; *Weil* v. *Black,* 76 W. Va. 685, 694.

In *Regina* v. *Garrett,* Dearsly's Crown Cases Reserved, 232, 241, Lord Campbell said:

" I do not proceed upon the ground that the offense was committed beyond the jurisdiction of the Court "—which was the fact there—" for if a man employ a conscious or unconscious agent in this country, he may be amenable to the laws of England, although at the time he was living beyond the jurisdiction."

It will be found among the earlier cases that the principle is sometimes qualified by saying that the person out of the State can not be held for a crime committed within the State by his procuration unless it is done by an innocent agent or a mechanical one; but the weight of authority is now against such limitation. Generally the

cases show that jurisdiction exists to try one who is a conspirator whenever the conspiracy is in whole or in part carried on in the country whose laws are conspired against. In *Hyde* v. *United States,* 225 U. S. 347; *Brown* v. *Elliott,* 225 U. S. 392, the question was whether a conspiracy could be tried, not where it was carried on, but in a place where only an overt act under it was performed by one conspirator. There was strong diversity of opinion among the Justices, though a majority sustained the venue following the Court of King's Bench in *Rex* v. *Brisac and Scott,* 4 East, 164. But we have no such ground for difference here, for the conspiracy was being carried on all the time by communications exchanged between the conspirators in San Francisco and on the high seas just beyond the three-mile limit near San Francisco Bay, and the overt acts were in both places.

·The whole question was fully considered from the international standpoint in a learned opinion by John Bassett Moore, now Judge of the Permanent Court of International Justice, while he was Assistant Secretary in the State Department, to be found in Moore's International Law Digest, vol. 2, p. 244. The report was made in view of controversy between this Government and the Government of Mexico in reference to the arrest and imprisonment of one Cutting for a libel charged to have been committed by Cutting in the publication of an article in a newspaper in the State of Texas. The prosecution was under Article 186 of the Mexican Penal Code. That code provided that penal offences committed in a foreign country against a Mexican might be punished in Mexico. Our government maintained that it could not recognize the validity of a prosecution in Mexico of an American citizen who happened thereafter to be there, for an offense committed in the United States, merely because it was committed against a Mexican. In the course of the examina-

tion of this question, Mr. Moore, recognizing the principle already stated, said:

" The principle that a man who outside of a country wilfully puts in motion a force to take effect in it is answerable at the place where the evil is done, is recognized in the criminal jurisprudence of all countries. And the methods which modern invention has furnished for the performance of criminal acts in that manner has made this principle one of constantly growing importance and of increasing frequency of application.

" Its logical soundness and necessity received early recognition in the common law. Thus it was held that a man who erected a nuisance in one county which took effect in another was criminally liable in the county in which the injury was done. (*Bulwer's case,* 7 Co. 2 b. 3 b.; Com. Dig. Action, N. 3, 11.) So, if a man, being in one place, circulates a libel in another, he is answerable at the latter place. (*Seven Bishops' Case,* 12 State Trials, p. 331; *Rex* v. *Johnson,* 7 East. 65.)"

After referring to the doctrine of innocent agent and its dependence on the distinctions between accessories and principal in crime, Judge Moore says (p. 249):

" But, as has been shown, the doctrine of accessoryship has been abolished by statute in many jurisdictions in which it formerly prevailed, and is condemned by many writers as unnecessary and unsound. Referring to accessories before the fact, Mr. Bishop says:

" ' The distinction between such accessory and a principal rests solely in authority, being without foundation either in natural reason or in the ordinary doctrines of the law. The general rule of the law is, that what one does through another's agency is to be regarded as done by himself.'

"And on this point he cites Broom's Legal Maxims, 2d ed., p. 643; Co. Lit. 258a; and the opinion of Hosmer, C. J., in *Barkhamsted* v. *Parsons,* 3 Conn. 1, that ' the

principal of common law, *Qui facit per alium, facit per se,* is of universal application, both in criminal and civil cases.' "

The overt acts charged in the conspiracy to justify indictment under § 37 of the Criminal Code were acts within the jurisdiction of the United States, and the con-spiracy charged, although some of the conspirators were corporeally on the high seas, had for its object crime in the United States and was carried on partly in and partly out of this country, and so was within its jurisdiction under the principles above settled.

We have thus disposed of the chief objections. There are some objections to the admission of evidence, one with respect to the receipt of a telegram charged by the Government to be from Belanger, a defendant, sent to Dorgan, his co-director of the Canadian corporation which owned the cargoes of liquor; another objection based on the receipt in evidence of eighty-three dollar bills cut in two with liquor orders written on them, associated in the evidence with Quartararo and charged to show that he had used them for the purpose of sending them out to the officers of the rum runners to identify his agents for the safe delivery of the liquor. Another was as to the evidence of a witness who pleaded guilty and who was permitted to testify that at the instance of Quartararo, shown by the evidence to be the chief operator in the conspiracy, he brought into San Francisco liquor in small boats, not only from the Quadra, the Coal Harbour and the Malahat, controlled by the Canadian corporation, but many times during the period of the conspiracy alleged in the indictment also from a vessel called the Norburn, without the direct evidence that the Norburn was controlled by the same Canadian corporation, and therefore that it was irrelevant evidence of another conspiracy rather than the one charged. With respect to all these instances, we think

that there was sufficient probable connection with the conspiracy already shown to allow the items of evidence to be introduced, leaving to the jury the weight of it, but that even if in any of such instances there was error, they were merely cumulative proof of the conspiracy which was practically undenied and their admission was harmless.

The judgment of conviction of the Court of Appeals is

*Affirmed.*