## THE SYLVIA II.

### UNITED STATES v. CARGO OF LIQUORS AND SEA STORES.

District Court, D. Massachusetts. August 6, 1928.

Nos. 61, 62.

Frederick H. Tarr, U. S. Atty., and Ellen L. Buckley, Asst. U. S. Atty., both of Boston, Mass.

Wm. H. Lewis and Matthew L. McGrath, both of Boston, Mass., for defendant.

MORTON, District Judge. These are two libels, the first for forfeiture of the cargo of Sylvia II, and the second for penalties against Thomas, her master, for alleged violations of our customs laws. They were heard together. The facts are as follows:

Sylvia II is a British auxiliary schooner. She sailed from St. Pierre, Miquelon, taking a clearance in ballast for sea. About eight miles out she took on board a cargo of alcohol, under an oral charter, whereby she was to proceed to the high seas between Cashes Ledge and a point about 20 miles off shore. She was to cruise back and forth on this line until met by boats from shore, which would give her a predetermined countersign. Thereupon she was to deliver her cargo to them. While on this voyage she was sighted at a point somewhat to the east of Cashes by United States cutter Tuskarora, which proceeded to trail her. Later Tuskarora was replaced in the trailing by United States cutter Active, which had been summoned by wireless. Active followed Sylvia II most of the day on July 21, 1927. During part of this time, and especially

during the latter part, Active crowded Sylvia II on her starboard or north side in an indefensible way, cutting across the latter's bow several times at close quarters, something for which, as there was the whole ocean to maneuver in, there can be no excuse. The intention evidently was to make Sylvia II change course towards the shore. She had to stop her engines once at least in order to avoid collision. Capt. Thomas, master of Sylvia II, does not, however, testify that he actually changed course because of this crowding, and I am not satisfied that it caused her to get within the 12-mile limit.

Being somewhat uncertain of his exact position, Capt. Thomas wished to ascertain it by sighting Highland Light on Cape Cod. He therefore held on towards the coast, accompanied by Active.

During the early evening of July 21st Boatswain Petersen, in command of Active, believed—and reported by wireless to his superiors—that Sylvia II had crossed the 12-mile line. No land was in sight; and the position of the vessels, which were then close together, was a matter of observation and dead reckoning. Petersen took what he testifies was a good star sight, which confirmed his dead reckoning position. He ordered United States Patrol No. 156, which was with Active, to run off by log the distance to the buoy at Peaked Hill Bar off the tip of Cape Cod. No. 156 did this both going and returning, and reported the distance as 7½ nautical miles. The buoy is about 2 miles from the nearest land. About the same time Petersen sighted Highland Light and took a bearing of it. These measurements and the view of the Light substantially confirmed the position as previously obtained.

Petersen thereupon boarded Sylvia II and demanded her manifest. Upon failure to produce a proper one, he seized her and brought her into Boston. Before leaving the vicinity where the seizure had been made, radio-compass bearings were obtained, which further confirmed the position as previously ascertained. This position was figured as 10.2 nautical miles from shore, and is so alleged in the libels. Capt. Thomas, of Sylvia II, and his son, who was on board with him, both testify that her position at the time of seizure was 19 miles off shore. They base their testimony on observations at sea, on dead reckoning, and on a view of Highland Light. As the light was nearly in range with the nearest shore, it afforded a basis for only a rather rough estimate as to the distance. It is

agreed by all the navigators who testified that an error of a mile might fairly be expected in ascertaining position by observation. Capt. Johnson, testifying for the claimant, says it would be much more.

It is argued for Sylvia II that on the government's evidence the margin was close, less than two miles; that the position fixed cannot be relied on within such a margin of error; and that, in view of the testimony of Capt. Thomas and his son, the government case is not satisfactorily proved. It is to be noticed, however, that the determination of the position as claimed by the government does not rest on astronomical observation alone. Other methods were availed of, and on the government's testimony all of them were in substantial accord. On all the evidence I am satisfied that the Sylvia II was at the time of the seizure within 12 miles of the shore on Cape Cod.

There remains the question whether she was liable to seizure. She had not unladen any of her cargo, nor been within any territorial waters of the United States since taking it on board. Nor had she been in contact with any boats from the shore, or been in contact with the shore herself. She was not, and had not been during the voyage, within a distance from the coast which she could traverse in one hour. British Treaty, art. II, cl. 3. Her master did not intend to come within 12 miles of our coast; his doing so was a mistake on his part. That the cargo was destined ultimately to this country, and that its destination was known to the master of Sylvia II, is clear.

The charges against her master and cargo are based on Tariff Act 1922, § 584 (19 USCA § 486), viz. that, being bound for the United States, she did not have on board a proper manifest and produce it to the boarding officer. The libels allege that Sylvia II was bound for the United States and required to make entry. Manifests are statements in official form, showing what merchandise a vessel carries. The object of them is to furnish the customs officers with a list to check against, to inform our revenue officers what goods are being brought into the country, and to provide a safeguard against goods being brought into this country on a vessel and then smuggled ashore. It was for those purposes, and to forestall that danger to the revenue, that the statute in question was passed. It is directed against a very different evil from that to which it is sought to apply it in this

case. The purpose of the statute is shown by its language. Section 584 is explicitly restricted to vessels or vehicles "bound to the United States," and the detailed provisions of the statute are adapted to carry out the purpose as above stated.

■ The government contends that "vessels * * * bound to the United States" should be construed to include any vessel whose *cargo* is destined to this country by transshipment on the high seas to other vessels or boats. In U. S. v. Bengochea, 279 F. 537 (C. C. A. 5th), and U. S. v. 63 Kegs of Malt ex Schooner Rosie M. B., 27 F.(2d) 741 (C. C. A. 2d), the statute in question was held applicable to foreign vessels intending to transship cargo within the 12-mile limit, but outside the 3-mile limit. While these decisions greatly broaden the statute, they do not cover the present case, because, as above stated, Sylvia II did not intend to discharge her cargo within the 12-mile limit. The openness of her conduct in proceeding as she did under close convoy of one of our cutters corroborates her master's statement on that point. The cases relied on by the government seem to me to go to the extreme limit in extending this statute by judicial construction. To some extent, at least, they disregard its language and the reason for it, and they carry it into a field which it was not intended to cover. The ground of forfeiture alleged against this vessel is hardly more than a colorable pretext. Her real offense is that she was hovering on our coast with cargo for smugglers. If the attempt is to be made—as it well might be—to seize and forfeit such foreign vessels, it should, in my opinion, rest on explicit authority from Congress, where the responsibility in such matters belongs, not on an ingenious perversion of this statute about manifests. The Circuit Court of Appeals in this circuit has declined to extend this statute as far as has been done in the Second Circuit.

Seijo v. U. S. (C. C. A.) 20 F.(2d) 904. Cf., contra, The Mistinguette (C. C. A. 2d) 27 F.(2d) 738. Cases in which the vessel had come into our territorial waters, or was found to have been bound to this country, stand, of course, on a very different footing; e. g., Gillam v. U. S. (C. C. A. 4th) 27 F.(2d) 296, opinion June 12, 1928; The Squanto, 13 F.(2d) 548 (C. C. A. 2d); The Pesaquid (D. C.) 11 F.(2d) 308.

■ Upon the facts stated I rule that Sylvia II was not bound for the United States, within the meaning of the statute in question, and that both libels must therefore be dismissed.

It is unnecessary to decide whether, as to British vessels, the 12-mile limit has been superseded by the one-hour distance specified in the treaty. But I may say that Ford v. U. S., 273 U. S. 593, at page 609, 47 S. Ct. 531, 71 L. Ed. 793, seems to me not inconsistent with the view which I expressed in The Frances Louise (D. C.) 1 F.(2d) 1004. Although in the Ford Case the court was dealing with a vessel which was seized within 6 miles of the shore, and was in contact with the shore (273 U. S. 604, 605, 47 S. Ct. 531, 71 L. Ed. 793), there is no reference in the opinion to the 12-mile limit. "The counter consideration moving to the United States is the enlargement and *a definite fixing* [italics mine] of the zone of legitimate seizure of British hovering vessels seeking to defeat the laws against importation of liquor into this country from the sea." Taft, C. J., 273 U. S. at page 609 (47 S. Ct. 536). See, too, at page 618 (47 S. Ct. 531). The government there rested its case against the defendants solely on the treaty. See page 600 (47 S. Ct. 531).

I am obliged to counsel for the United States for calling my attention to the very recent cases, decided since this was argued.

Decree that both libels be dismissed.