## THE MARION PHILLIS.

Circuit Court of Appeals, Second Circuit.
December 2, 1929.

### No. 75.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Herbert H. Kellogg and William T. Cowin, Asst. U. S. Attys., both of Brooklyn, N. Y., of counsel), for appellant.

Louis Halle, of New York City, for appellees.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge. Section 584 of the Tariff Act of 1922 (19 USCA § 486) an alleged violation of which is the basis of the libel, reads as follows:

"Any master of any vessel and any person in charge of any vehicle bound to the United States who does not produce the manifest to the officer demanding the same shall be liable to a penalty of $500, and if any merchandise, including sea stores, is found on board of or after unlading from such vessel or vehicle which is not included or described in said manifest or does not agree therewith, the master of such vessel or the person in charge of such vehicle shall be liable to a penalty equal to the value of the merchandise so found or unladen, and any such merchandise belonging or consigned to the master or other officer or to any of the crew of such vessel, or to the owner or person in charge of such vehicle, shall be subject to forfeiture and if any merchandise described in such manifest is not found on board the vessel or vehicle the master or other person in charge shall be subject to a penalty of $500. * * *"

The libel was dismissed on the ground that the evidence did not prove that the schooner was a "vessel bound to the United States." The correctness of this conclusion is the only question of importance presented by the appeal, it being conceded upon the argument that the schooner had no manifest and was within four leagues of the coast when the production of her manifest was demanded. Section 581 (19 USCA § 481).

According to her clearance papers the Marion Phillis left St. Pierre, Miquelon, on October 12, 1927, for Nassau, British West Indies. Her cargo consisted of whisky, champagne, and gin in bags, cases, and barrels. When sighted by the Coast Guard patrol boat Travis on the afternoon of October 24, 1927, the schooner was about 30 miles off Barnegat Light, New Jersey, and was sailing northeast; that is, in a direction almost directly away from her ostensible port of destination. For 2½ days the schooner continued in the same general direction, and was trailed by the patrol boat which kept within half a mile of her and on one occasion came so close that two cases of whisky were passed from the deck of the schooner to the deck of the patrol boat. Parenthetically it may be mentioned that the captain of the Travis testified that the cases of whisky were returned to the schooner and that the member of his crew who received them was disciplined therefor. At 5 o'clock on the morning of October 27th, the schooner was about 6½ miles off shore and heading for the Long Island coast. This was the first time that she had been within the 12-mile limit. She was ordered to stop, was boarded by an officer of the Travis, and the manifest was demanded of her captain. He denied that he had a manifest, or that he knew of what his cargo consisted. He intimated that he had gotten within the 12-mile limit by mistake, and a member of his crew protested that they were outside it. After the boat had been seized and taken to the port of New York, the captain explained that he was to meet a three masted schooner in the vicinity of Shinnecock Light and transfer his cargo of liquor to her. He did not know the name of this vessel, but said she was to fly a yellow flag with a black ball in the center by which he could identify her.

It is perfectly clear that the schooner was not bound for Nassau. For three days she had sailed in the opposite direction, without stress of weather or other excuse. What, then, was her purpose? The plain and reasonable inference is that she was seeking an opportunity to discharge her cargo on or near the Long Island coast, either by proceeding herself into territorial waters, or by meeting contact boats outside the three-mile but within the 12-mile limit, or by transshipment to smugglers beyond the 12-mile limit. Whichever method of discharge she might employ it seems to us beyond reasonable doubt that her contraband cargo was intended to be smuggled to our shores. Moreover, where reasonable cause for instituting the suit for forfeiture is shown, the burden of establishing innocence is upon the claimant. Section 615 (19 USCA § 525); The Squanto (C. C. A.) 13 F.(2d) 548, 551. True, an opportunity to accomplish her purpose had not yet occurred, and with a patrol boat at her heels it might never occur. Perhaps she hoped to corrupt the Coast Guards, as her gift of whisky suggests; perhaps under cover of night she expected to make contact with local boats, despite the proximity of the patrol boat; perhaps, in the end she would have abandoned her purpose. Into these speculations we need

not enter. The important fact is that there is nothing to indicate that she had changed her intention at the time she was seized. So the question is simply whether a vessel carrying cargo intended to be landed upon our shores in one or another of the methods above mentioned is a "vessel bound to the United States."

In The Mistinguette, 27 F.(2d) 738, certiorari denied 278 U. S. 627, 49 S. Ct. 28, 73 L. Ed. 547, we held that a vessel which intended to discharge her cargo within territorial waters was bound to the United States. In United States v. 63 Kegs of Malt, 27 F.(2d) 741, certiorari denied 278 U. S. 628, 49 S. Ct. 28, 73 L. Ed. 547, we applied the statute to a vessel intending to discharge into contact boats within 4 leagues of the coast, without herself entering territorial waters. In accord are United States v. Bengochea, 279 F. 537 (C. C. A. 5), and Gillam v. United States, 27 F.(2d) 296 (C. C. A. 4). It remains to consider whether the statute is equally applicable to a vessel intending to transship her cargo to smugglers outside the twelve mile limit—which may conceivably have been the purpose of the Marion Phillis, if one believes the evidence tending to show that she came within twelve miles of the coast by mistake.

If the phrase "vessel bound to the United States" may properly be interpreted to describe a vessel whose cargo is destined for our shores by transfer to smugglers within twelve miles of the coast, as the above cases hold, it seems equally apt to describe a vessel whose intention is to discharge to smugglers beyond the twelve mile limit. It is the intention to bring cargo near enough to our shores to be smuggled in, not the crossing of the twelve mile line, which makes the vessel one "bound to the United States." It is true that no offense under section 584 of the Tariff Act of 1922 (19 USCA § 486) can be committed until that line is crossed, for until then there is no statutory duty to produce a manifest upon demand. Section 581 (19 USCA § 481) ; The Pictonian (C. C. A.) 20 F.(2d) 353, 354. But having crossed it, the vessel becomes subject to that duty, if she answers to the description of a vessel bound to the

United States, and whether she crossed intentionally or by mistake seems quite immaterial with respect to the commission of her offense or the right to seize her. In The Sylvia II, 28 F.(2d) 215 (D. C. Mass.), it was intimated that too broad an interpretation had been accorded the statute by our decision in the Kegs of Malt Case, and the court refused to apply it to a vessel which intended to transship to smugglers outside the twelve mile limit. But we are not disposed to retract our decision in United States v. 63 Kegs of Malt, supra, and so long as that interpretation stands we see no ground for differentiating between vessels transshipping to smugglers within or without the 12-mile line, provided, of course, that the vessel is within it when her manifest is demanded. The purpose of a manifest is not merely to collect duties, but is also to inform government officials whether forbidden things are being imported. United States v. Sischo, 262 U. S. 165, 167, 43 S. Ct. 511, 67 L. Ed. 925. This purpose will be promoted by interpreting the phrase "bound to the United States" to include a vessel which hovers outside the 12-mile limit with contraband for smugglers, even though no manifest may legally be demanded unless she crosses the line. We cannot agree with the lower court's finding that the Marion Phillis was not bound to the United States.

With respect to forfeiture of the cargo, it is suggested that the libel contains no allegation that the unmanifested cargo was consigned to the master, or other officer or member of the crew. The master appears to have had complete control of the cargo, with no papers to show that it belonged to any one else. Under the authorities, this would supply reasonable cause for forfeiture on the ground that he was the consignee. Gillam v. United States, 27 F.(2d) 296, 303 (C. C. A. 4) ; The Mistinguette, 27 F.(2d) 738, 740 (C. C. A. 2). If there was a defect in pleading it may be cured to conform to the proofs.

For the reasons stated we think it was error to dismiss the libel, and the decree is accordingly reversed, and a decree of forfeiture directed.