**UNITED STATES of America, Plaintiff,**

v.

**Robert Alexander BEST, John Doe also known as "Narcisso," John Doe also known as "Jackie," John Doe also known as "Lao Gao," Defendants.**

No. CR.2001–202.

District Court, Virgin Islands, D. St. Thomas and St. John.

Oct. 26, 2001.

Sarah Weyler, Asst. U.S. Attorney, St. Thomas, VI, for the plaintiff.

David Comeaux, St. Thomas, VI, for the defendant.

## MEMORANDUM

MOORE, District Judge.

Robert Alexander Best ["defendant" or "Best"], a Guyanese national, challenges the jurisdiction of this court to prosecute him for conspiracy to bring aliens to the United States and for bringing aliens into

the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(i), (v) and (B)(i). For the reasons stated, the charges against the defendant will be dismissed for lack of jurisdiction over his person.

## BACKGROUND

On May 16, 2001, the United States Coast Guard Cutter *Nunivak* intercepted, boarded, and detained the M/V *Cordeiro de Deus* "approximately sixteen nautical miles generally east of St. Croix,"[1] one of the islands making up the United States Virgin Islands. The Coast Guard boarding party determined that the vessel was sailing under the Brazilian flag and received consent to board. Upon boarding the vessel, the Coast Guard discovered hidden in the cargo hold thirty-three persons who appeared to be from China or some other Asian country. After learning that the individuals were citizens of the People's Republic of China, the *Nunivak* notified the United States Immigration and Naturalization Service ["INS"]. The Coast Guard remained on board the *Cordeiro de Deus* and supervised the navigation of the vessel into United States territorial waters north of St. Croix off the main town of Christiansted. INS officials, including a criminal investigator, Special Agent David Levering, arrived at the *Nunivak* late on May 17th and boarded the *Cordeiro de Deus* early the next day while it continued to steam back and forth off St. Croix. On the 18th, Agent Levering and another agent interviewed each of the thirty-three Chinese aliens. These interviews established that the aliens intended to come into the United States.

Beginning on May 17th, there was a series of conference calls with various executive agencies, including INS headquarters, the Department of State, the U.S. Attorneys office, and possibly a representative from the United States embassy in Suriname, in an effort to determine what to do with the crew and aliens on board the *Cordeiro de Deus*.[2] No consensus was reached until the morning of May 19, 2001, when the United States authorized the INS officials to prosecute certain individuals on board the *Cordeiro de Deus* for suspected violations of United States immigration laws. Although the Coast Guard has mechanisms in place for obtaining the consent of the nation under whose flag a foreign vessel sails to seize it and the persons on board and prosecute them for violations of United States immigration and other laws, the United States neither sought nor obtained Brazil's consent to prosecute Best and the two Brazilian crewmen during these two days the Coast Guard and INS officials held the vessel at sea. On May 19, 2001, the crewmen, including defendant Best, and four Chinese nationals were transferred from the *Cordeiro de Deus* to a Coast Guard boat and taken to Christiansted on St. Croix.

In Count One of the superseding indictment filed September 7, 2001, the United States alleges that Best conspired with the co-defendants, with unindicted co-conspirators, with Yuan Ping Zheng, a co-defendant who had pled guilty to the charge of conspiracy alleged in the original indictment,[3] and with others known and un-

---

1. As stipulated by the parties at the outset of the hearing on motions, October 17, 2001.

2. These conference calls were done pursuant to Presidential Directive/NSC–27 (Jan. 19, 1978) ["PD–27"], which requires coordination within the executive branch of the government for non-military incidents which

could have an adverse impact on U.S. foreign relations.

3. Yuan Ping Zheng was one of the thirty-three Chinese aliens aboard the *Cordeiro de Deus* when it was intercepted in the contiguous zone by the Coast Guard. In the original two-count indictment returned on June 7, 2001, Zheng was charged, along with Best

known to violate United States immigration laws. *See* 8 U.S.C. § 1324(a)(1)(A)(v). The alleged object of the conspiracy was "to bring and attempt to bring illegal aliens to the United States at a place other than a designated port of entry." Counts Two through Thirty-three charge the defendant with the substantive crimes for each individual alien transported. *See* 8 U.S.C. § 1324(a)(1)(A)(i). Although the indictment recites that these offenses were committed "in the District of the Virgin Islands and elsewhere," the United States has conceded that none of the alleged acts by Best or any of his co-defendants or co-conspirators were committed within its territory or territorial sea.

In his motion to dismiss, Mr. Best argues that the Court lacks jurisdiction to try him for violations of section 1324 because he did not commit any act of the offenses charged within the territory of the United States and that the Court lacks jurisdiction over his person because he was taken from the high seas for prosecution in the United States in violation of international law. The United States counters first that the offenses were committed within the contiguous zone of the territorial sea, an area it argues is within the jurisdiction of the United States for purposes of enforcing immigration laws. The United States next argues that because section 1324 applies extraterritorially, a foreign national such as the defendant may be prosecuted and convicted of alien smuggling even when the acts constituting the offense took place entirely without the territory of the United States, and even when the foreign national was apprehended on the high seas and has never before been in the United States or otherwise come with-

in the jurisdictional authority of the United States.

## DISCUSSION

It is essential to understand at the outset what this case is and what it is not about. At issue here is the relatively narrow question of what procedures the United States must employ to obtain personal jurisdiction over a foreign national on board a foreign-flagged vessel intercepted on the high seas to prosecute him for violations of immigration laws committed wholly outside the territory and territorial sea of the United States. This case is not about the permissible methods for obtaining personal jurisdiction over an alien found on the soil of a foreign country and bringing him to trial in a United States court for violations of immigration laws committed wholly in that country or in other foreign countries.

■ Accordingly, the generally accepted rule appears to be that a district court can have subject matter jurisdiction to try and convict a person of alien smuggling even when all the acts constituting the offense are committed in another country and wholly outside the territory of the United States, although Congress has not expressly stated that section 1324 applies extraterritorially. *See United States v. Aguilar,* 883 F.2d 662, 692 (9th Cir.1989) (upholding conviction where the defendant's acts of inducing aliens to enter the United States took place entirely in Mexico); *United States v. Castillo Felix,* 539 F.2d 9, 12–13 (9th Cir.1976) (upholding conviction where the defendant's acts of inducing the unlawful entry of aliens because the effect of the crime took place in the United States); *United States v. Beli-*

and two Brazilian crewmen, with conspiracy to bring illegal aliens into the United States and attempting to bring aliens into the United States, in violation of the relevant provisions of 8 U.S.C. § 1324. Zheng pled guilty to the conspiracy count, and all charges against the

two Brazilian crewmen were dismissed on motion of the United States on August 31, 2001. The remaining thirty-two aliens and the two Brazilian crewmen are being held as material witnesses for Best's trial.

*ard,* 618 F.2d 886, 887 (1st Cir.1980) (recognizing that convictions for inducing or encouraging the unlawful entry of aliens into the United States in violation of 8 U.S.C. § 1324 may be sustained where the defendant's acts of inducement or encouragement took place outside the United States); *see also United States v. Bowman,* 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922) (establishing the general proposition that, although Congress has not expressly declared a statute to apply extraterritorially, courts may infer the requisite intent "from the nature of the offense"). These extraterritorial applications of section 1324 appear to comport with accepted principles of international law. Note well that not one of these cases or of the cases cited by the United States in its pleadings involves prosecution of an alien apprehended on the high seas and forcibly brought into the United States by its law enforcement agents.

■ As restated by the American Law Institute, the primary basis of extraterritorial jurisdiction recognized by the United States is the "subjective territorial principle," by which "a state has jurisdiction to prescribe law with respect to ... conduct that, wholly or in substantial part, takes place within its territory." RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 402(1)(a) ["RESTATE-MENT"]. The United States also recognizes five other principles of jurisdiction under international law by which a nation may reach conduct outside its territory: (1) the objective territorial principle; (2) the protective principle; (3) the nationality principle; (4) the passive personality principle; and (5) the universality principle. *United States v. Usama Bin Laden,* 92 F.Supp.2d 189, 196 (S.D.N.Y.2000)(citing Christopher L. Blakesley, *Extraterritorial Jurisdiction, in* INTERNATIONAL CRIMINAL LAW 50–81 (2d ed.1999)). Section 402(1)(c) of the Restatement, in particular, states the "objective territoriality principle" as providing that a nation has jurisdiction to prescribe law with respect to "conduct outside its territory that has or is intended to have substantial effect within its territory." RESTATEMENT § 402(1)(c) (the "effects principle"); *see id.* § 402(3) & cmt. d (setting forth the protective principle, which "may be seen as a special application of the effects principle"); *id.* § 431 (jurisdiction to enforce); *see also Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911) ("Acts done outside a jurisdiction, but intended to produce *and producing* detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power.") (emphasis added).[4]

4. Although it is not applicable to this case because it involved narcotics violations which are universally condemned by all civilized nations, and not infringement of immigration laws which is not so universally condemned, I note a decision of the Court of Appeals for the Third Circuit, *United States v. Wright–Barker,* 784 F.2d 161, 168–69 (3d Cir.1986). In *Wright–Barker,* the Court of Appeals broadened the extraterritorial scope of United States drug laws for cases involving drug smuggling by eliminating one of the prongs of the Supreme Court's test for extraterritorial application of federal law set forth by Mr. Justice Holmes in his oft-cited landmark opinion in *Strassheim v. Daily.* The Court of Appeals approved the rule as formulated in then-draft Restatement § 402 that "international law permits such jurisdiction ... if intended effects in the United States [only], and not actual effects, are proven," recognizing that "cases involving only intended effects are rare ... [and] subject to the principle of reasonableness." *Id.* at 168-69 (citing comment d to section 402) (subsequently overruled by statute as recognized by *United States v. Martinez–Hidalgo,* 993 F.2d 1052, 1056 (3d Cir.1993) in the specific area of maritime drug trafficking laws, 46 U.S.C. app. § 1903).

■ That the United States may have subject matter jurisdiction to proscribe and to punish conduct committed wholly outside the territory of the United States intended to have an adverse effect within the United States, however, does not guarantee that the United States can hold and try Mr. Best *in this case* for such conduct. As already noted, this defendant has challenged this Court's jurisdiction over his person, as well as its subject matter jurisdiction over his extraterritorial conduct. As in civil cases, jurisdiction over the subject matter in a criminal case is entirely distinct from jurisdiction over the person. *See* 1A WRIGHT, FEDERAL PRACTICE & PROCEDURE: CRIMINAL 3D § 193, at 336 (1999). Also as in civil cases, a challenge to personal jurisdiction in a criminal case must be raised before trial or else it is waived. *See id.* § 193 n. 19 (collecting cases); FED. R. CRIM. P. 12(b), (c), & (f); *see also, e.g., Ford v. United States*, 273 U.S. 593, 606, 47 S.Ct.

531, 71 L.Ed. 793 (1927) (rejecting a challenge to jurisdiction based on seizure of a foreign vessel outside limits agreed by the United States and Great Britain on the grounds that it was untimely: "The proper way of raising the issue of fact of the place of seizure was by a plea to the jurisdiction" raised before trial); *United States v. Rosenberg*, 195 F.2d 583, 602–03 (2d Cir. 1952) (recognizing the distinction between subject matter and personal jurisdiction in criminal cases, but rejecting appellant's challenge to personal jurisdiction because he did not raise it before trial); *Pon v. United States*, 168 F.2d 373, 374 (1st Cir. 1948) (rejecting a challenge to jurisdiction over the person because it was not timely raised). Having raised the question of jurisdiction in a motion to dismiss filed before the deadline for filing pretrial motions under the Federal Rules of Criminal Procedure, the defendant here has timely challenged jurisdiction over his person. *See* FED. R. CRIM. P. 12(c); *see also* WRIGHT, *supra* § 193, at 337.[5]

In *United States v. Viegers*, I relied on Wright Barker to conclude that extraterritorial application of section 1324 is "reasonable" even when only intended effects can be shown. Crim. No. 1994-143, 1994 WL 635044, at *2 (D.V.I. Nov. 7, 1994). In addition to challenging the extraterritorial application of section 1324, the defendant in *Viegers* challenged the propriety of the Coast Guard official's initial boarding and search of a vessel intercepted on the high seas. Unlike the defendant here, Viegers made no specific challenge to the Court's jurisdiction over his person on the grounds that it was obtained in violation of international law.

Even the Restatement's rendition of the "objective territoriality principle" in section 402(1)(c) (providing that a nation has jurisdiction to prescribe law with respect to "conduct outside its territory that has *or* is intended to have substantial effect within its territory"), seems to convert Justice Holmes's test to one with two alternative prongs. Since both the Court of Appeals for the Third Circuit and the Restatement appear to allow extraterritorial jurisdiction of a United States statute from intended effects alone without any actual substantial effect in the United States, I am constrained to accept the principle that the United States can apply a statute extraterritorially under the objective principle even when the allegedly offensive conduct has produced no actual adverse effects in the United States.

5. The courts in both *Ford v. United States* and *Pon* applied the former rule that a plea to personal jurisdiction in a criminal case must be raised before a plea of not guilty. *See Ford*, 273 U.S. at 606, 47 S.Ct. 531; *Pon*, 168 F.2d at 374. Rule 12(a) of the Federal Rules of Criminal Procedure, however, was enacted to "abolish[ ] pleas to the jurisdiction, pleas in abatement, demurrers, special pleas in bar, and motions to quash." FED. R. CRIM. P. 12 advisory committee note 1 (1944 adoption). Under Rule 12(a), "[a]ll other pleas, and demurrers and motions to quash are abolished, and defenses and objections raised before trial which heretofore could have been raised by one or more of them shall be raised only by motion to dismiss or to grant appropriate relief, as provided by these rules." Moreover, the United States has not challenged the timeliness of Best's motion to dismiss.

The United States asserts this Court has personal jurisdiction to try Best and that the manner in which the defendant is brought before the Court is irrelevant for purposes of subject matter or personal jurisdiction. According to the United States, this Court has jurisdiction over the defendant whether he was found in the contiguous zone, extradited from another country, or kidnaped from another jurisdiction. I cannot agree.

The United States and Mr. Best have stipulated that the United States seized the M/V *Cordeiro de Deus* sixteen miles from St. Croix, which I find to be within the contiguous zone to the territorial sea of the United States. The contiguous zone to the territorial sea of the United States encompasses the sea between twelve and twenty-four nautical miles out from the coast. *See* Presidential Proclamation No. 7219, 64 Fed.Reg. 48701 (Aug. 2, 1999). The contiguous zone of the United States

> is a zone contiguous to the territorial sea of the United States, in which the United States may exercise the control necessary to prevent infringement of its customs, fiscal, immigration, or sanitary laws and regulations within its territory or territorial sea, *and to punish infringement of the above laws and regu-*
>
> *lations committed within its territory and territorial sea.*

*See id.* (emphasis added).[6]

■ Unlike cases involving forcible abduction or alleged violations of extradition treaties relied on by the United States, *see, e.g., United States v. Alvarez-Machain,* 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), the seizure of the M/V *Cordeiro de Deus* in the contiguous zone beyond the twelve-mile territorial sea of the United States[7] was subject to established international law of the high seas universally recognized by all civilized nations including the United States. *See United States v. Romero-Galue,* 757 F.2d 1147, 1149 n. 1 (11th Cir.1985)· ("The high seas lie seaward of a nation's territorial sea, which is the band of water that extends up to [twelve miles] out from the coast. No nation may assert sovereignty over the high seas."). The contiguous zone does not expand the territorial limit of the United States. *See United States v. McRary,* 665 F.2d 674, 676 (5th Cir.1982) (correcting the trial judge's mistaken belief that the contiguous zone expanded the territorial limit of the United States and stating that "[the contiguous zone] is part of the high seas"). Vessels sailing on the high seas are "not subject to interference" unless the ship "(1) is engaged in piracy, slave trade, or unauthorized broadcasting; (2) is without nationality; or (3) though

---

**6.** *See also Law of the Sea: Convention on the Territorial Sea and the Contiguous Zone* art. 24, 15 U.S.T. 1606, 516 U.N.T.S. 205 (entered into force Sept. 10, 1964) (setting forth the control permitted to coastal States within their contiguous zones). Presidential Proclamation No. 7219 brings the United States in line with Article 33 of the United Nations Convention on the Law of the Sea ["UNCLOS"], S. Treaty Doc. No. 103–39 (opened for signature Dec. 10, 1982) (signed by the United States July 29, 1994 and transmitted to the Senate on October 7, 1994), which is intended to prevail over the four Geneva Conventions of April 29, 1958 as the international law of the sea. *See* UNCLOS art. 311(1).

**7.** The territorial sea extends twelve nautical miles from the coast. *See* Presidential Proclamation No. 5929, 3 C.F.R. 547 (1988) (declaring the territorial sea to extend twelve miles out from the coast); Antiterrorism and Effective Death Penalty Act of 1996, § 901(a), Pub.L. No. 104–132, 110 Stat. 1214, 1317 (1996), *reprinted at* 18 U.S.C. § 7 note (Congressional enactment of Presidential Proclamation No. 5929).

flying a foreign flag or refusing to show its flag, is in fact of the same nationality as the warship or law enforcement ship." RESTATEMENT § 522(2).

The United States generally recognizes that it must first obtain consent from the nation under whose flag the ship is sailing before it can seize a foreign vessel and try the persons aboard for violations of United States laws, unless the ship is engaged in piracy, slave trade, or unauthorized broadcasting, or is sailing under no nation's flag. *See id.* § 522 cmt. e ("[I]nterference with a ship that would otherwise be unlawful under international law is permissible if the flag state has consented."); *see also Ford v. United States,* 273 U.S. at 606, 47 S.Ct. 531 (recognizing that personal jurisdiction over defendants aboard a foreign vessel on the high seas must be premised on an agreement). Although consent is ordinarily required by formal international agreement, *see Convention on the High Seas,* 13 U.S.T. 2312, 450 U.N.T.S. 82, art. 22 (entered into force September 30, 1962), in instances involving maritime traffic in narcotic drugs, the United States has long made a practice of obtaining consent from flag nations through informal communications between the Coast Guard and officials of the flag nation. *See United States v. Romero–Galue,* 757 F.2d at 1149, 1152–53 (rejecting challenge to such informal consent). In 1986, Congress expressly confirmed this practice in the Maritime Drug Law Enforcement Act, embodied in section 3202 of the Anti–Drug Abuse Act of 1986, Pub.L. 99–570 (codified at 46 U.S.C. § app.1903(c)(1)). That statute allows the United States to enforce its drug trafficking laws against persons aboard a foreign vessel when the flag nation has consented or waived objection. *See* 46 U.S.C. app. § 1903(c)(1).

■ More particularly, the United States recognizes that it must first obtain consent from the nation under whose flag the ship is sailing before it can seize a foreign vessel and try the persons aboard for violations of United States immigration laws, unless one of the three exceptions applies. In 1981, the United States entered into an agreement with Haiti to establish a "cooperative program of interdiction" on the high seas premised on the United States' "regard to the need for international cooperation regarding law enforcement measures taken with respect to vessels on the high seas." *See* Agreement effected by exchange of notes, United States–Haiti, T.I.A.S. No. 10241, 33 U.S.T. 3599 (signed and entered into force Sept. 23, 1981).[8] By that agreement, Haiti authorized the United States to board Haitian flag vessels on the high seas in order to ascertain whether there were any Haitians on board intending to commit an offense against United States immigration laws as well as detain the vessel and return it and the persons aboard to Haiti, or to release them on the high seas to a representative of Haiti. *See id.,* 33 U.S.T. at 3559–60 ("[T]he Government of the Republic of Haiti consents to the detention on the high seas by the United States Coast Guard of the vessel and persons found on board."); *see also Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 160 n. 8, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993).

The United States argues that Presidential Proclamation No. 7219, which defines the power of the United States within that

---

**8.** On the same day the agreement was made with Haiti, the President issued a proclamation authorizing the interdiction of "certain vessels" carrying aliens. 46 Fed.Reg. 48107; *see also* 46 Fed.Reg. 48109 (October 1, 1981), *reprinted in* 8 U.S.C. § 1182 note (executive order defining one class of vessels as those of foreign nations with whom the United States has an arrangement authorizing the United States to stop and board). The agreement was unilaterally terminated by the president of Haiti on September 14, 1994.

portion of the high seas comprising the contiguous zone, confers on the United States the power to "enforce" immigration laws beyond the territorial sea out to the twenty-four mile limit of the contiguous zone. Because the M/V *Cordeiro de Deus* was intercepted sixteen miles from St. Croix, the argument goes, when Best was apprehended, he was under the authority of the United states to "enforce" the immigration offenses committed within the contiguous zone and beyond. Although international law clearly permits the United States to establish a contiguous zone in which it may interfere with foreign vessels beyond the three exceptions permitted under Restatement § 522(2), the prosecution here seriously misreads the breadth of the additional powers the President conferred on the United States, as a plain reading of the proclamation itself demonstrates.

After first stating that the United States may exercise the control in the contiguous zone necessary to prevent infringement of its immigration laws and regulations within its territory or territorial sea, the proclamation goes on clearly to limit the exercise of that broad control to *punish* only the "infringement of [those] laws and regulations *committed within its territory and territorial sea*." 64 Fed.Reg. 48701 (emphasis added). The prosecution does not allege that Best committed any acts infringing its immigration laws within United States territory or territorial sea. The United States also concedes that none of the acts by any co-defendant or co-conspirator which form the bases of the conspiracy and substantive charges under 8 U.S.C. § 1324 were committed within its territory or territorial sea.[9] The best the prosecution can do is present evidence that the acts constituting the alleged infringements of United States immigration law were committed on that part of the high seas which the United States has proclaimed as the zone contiguous to its territorial sea.

Moreover, the Presidential Proclamation was expressly intended to bring federal criminal jurisdiction in line with accepted international law. *See id.* (declaring the contiguous zone "in accordance with international law"). To try a person found aboard a foreign vessel on the high seas for conduct occurring wholly outside its territory, the United States must obtain consent from the flag nation. Reading the Presidential Proclamation of the United States powers within the contiguous zone of the high seas together with the existing *international law of the sea, it is clear that,* absent consent from the ship's flag nation to do otherwise, the United States can only exercise its authority over aliens aboard a foreign ship within the contiguous zone as necessary to punish the infringement of immigration laws by one or more acts committed within United States territory or territorial sea.

In this case, the Coast Guard neither obtained consent nor attempted to obtain the formal or informal consent of Brazil, the nation under whose flag the *Cordeiro de Deus* was sailing, to seize the ship and to seize, prosecute, or convict persons aboard for criminal violations of United States immigration law. The United States has given no explanation why it did not follow the mechanisms in place for obtaining Brazil's consent or waiver of consent to prosecute persons sailing in international waters under its national flag. As evidenced by the several "PD–27" conferences with high agency officials, including a representative from the United States Embassy in Suriname, that took place during the two- to three-day period between the interception and the decision to bring Mr. Best and the others into St. Croix, the

9. The parties agreed that no acts occurred within the United States during a post-hearing telephone conference held on October 23, 2001.

United States had ample opportunity to obtain Brazil's consent to the prosecution. There were certainly no exigent circumstances or any other reason given or evident in the record that might have prevented the United States from doing so.

In section 1903(d) of the Maritime Drug Law Enforcement Act, Congress specifically provided that

> [a]ny person charged with a violation of this section shall not have standing to raise the claim of failure to comply with international law as a basis for a defense. A claim for failure to comply with international law in the enforcement of this Act may be invoked solely by a foreign nation, and a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense to any proceeding under this Act.

46 U.S.C. app. § 1903(d). Assuming that, as it did with maritime drug trafficking laws, Congress could override an individual defendant's right to challenge the legality of the seizure, arrest, and prosecution and vest that right in the relevant flag country for purposes of immigration laws, it has not done so.

Accordingly, I must apply the clear terms of the proclamation and international law and hold that this Court does not have jurisdiction to try Robert Alexander Best for violations of 8 U.S.C. § 1324 because he was intercepted and seized while on a foreign vessel on the high seas without the consent of country under whose flag he was sailing.

**CONCLUSION**

Although constrained to agree that section 1324 may apply extraterritorially to conduct committed wholly outside the United States, the Court nevertheless does not have personal jurisdiction over the defendant in this case to try him for violations of that statute. Accordingly, the defendant's motion to dismiss the indictment will be granted.