Clarence B. BAILEY, Appellant,

v.

FEDERAL INTERMEDIATE CREDIT
BANK OF ST. LOUIS, Appellee.

No. 85–1660.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1985.

Decided April 9, 1986.

Rehearing and Rehearing En Banc
Denied May 30, 1986.

Thomas E. Hankins, Gladstone, Mo., for appellant.

George F. Smith, St. Louis, Mo., for appellee.

Before ARNOLD and WOLLMAN, Circuit Judges, and GUNN,* District Judge.

* The HONORABLE GEORGE F. GUNN, JR., United States District Judge for the Eastern District of Missouri, sitting by designation.

WOLLMAN, Circuit Judge.

Clarence B. Bailey, formerly chief executive officer of the Osage Production Credit Association, seeks a declaratory judgment that the Federal Intermediate Credit Bank of St. Louis exceeded its lawful authority when in March 1984 it removed him from that position. The district court [1] on cross motions for summary judgment found for the Bank, *Bailey v. Federal Intermediate Credit Bank,* 608 F.Supp. 1009 (W.D.Mo. 1985),[2] and on appeal we affirm.

The Osage Production Credit Association and the Federal Intermediate Credit Bank of St. Louis both are federally chartered instrumentalities of the United States functioning within the federal farm credit system as that system was reorganized by the Farm Credit Act of 1971, Pub.L. No. 92–181, 85 Stat. 583 (codified as amended at 12 U.S.C. §§ 2001–2260 (1982)). The farm credit system consists of twelve districts, each headed by a board of directors and each including one federal intermediate credit bank (plus other institutions not relevant here). The intermediate credit banks have responsibility for the production credit associations (PCA's) within their geographic areas, with the PCA's making the actual loans to individuals for farm-related purposes. PCA's, however, fund such loans primarily through money borrowed in turn from intermediate credit banks. The farm credit system as a whole is regulated by the Farm Credit Administration (FCA), an independent executive agency which sets policy and exercises supervisory authority.[3]

The Federal Intermediate Credit Bank of St. Louis heads the farm credit district which encompasses the Osage PCA. In its letter removing Bailey as Osage chief executive officer, the Bank justified its action as an exercise of the supervisory powers vested in it by section 2072 of title 12 of the U.S.Code. Furthermore, it pointed to section 500.2 of the Osage PCA's bylaws, wherein it is provided that a chief executive officer should serve at the pleasure of the PCA board or until "removed * * * by the bank." PCA bylaws, however, are drawn up by the FCA and adopted in a standardized format (with options on some provisions) by the local associations. *See* 12 U.S.C. §§ 2091, 2252(a)(2). Thus, Bailey argues, bylaw section 500.2 cannot be a source of authority for his removal by the Bank because the bylaw presumes to grant to the Bank powers in excess of those vested in that institution by the legislation that created it.

■ Our review of this assertion begins from the premise that an agency's view with regard to the proper construction of a statute it is charged with administering is entitled to considerable deference. *Chemical Manufacturers Association v.*

---

1. The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri.

2. The district court subsequently dismissed without prejudice Bailey's pendent state claims for lack of jurisdiction, and that action is not challenged on appeal.

3. The Farm Credit Act has been amended since oral argument was heard in this case, Farm Credit Amendments Act of 1985, Pub.L. No. 99–205, 1985 U.S.Code Cong. & Ad.News (99 Stat.) 1678, and the changes include addition of an express power of removal over system directors and officers. *Id.* § 204, 99 Stat. 1694, 1696. That power, however, is vested in the FCA and extends to *all* (and not just PCA) officers and directors; and as the legislative history makes clear, the concern of Congress was with decreasing the FCA's day-to-day involvement and increasing its role as an "arm's length" regulator of the farm credit system. H.R.Rep. 425, 99th Cong., 1st Sess. 3, 12–13 (1985), *reprinted in* U.S.Code Cong. & Ad.News 1985, at 2587, 2589, 2598–99. The legislation neither implicitly nor explicitly suggests any changes in the basic relationships between the institutions within the system itself, for example, between intermediate credit banks and PCA's.

For more detail on the farm credit system and its history, see *Daley v. Farm Credit Administration,* 454 F.Supp. 953, 954 (D.Minn.1978); H.R. Rep. 425, *supra,* at 5–6; *reprinted* at 2591–92; 12 C.F.R. §§ 600.1–.60, 611.100–.1000 (1985); K. Meyer, D. Pedersen, N. Thorson & J. Davidson, *Agricultural Law* 269–70, 272–73 (1985); Brake, *A Perspective on Federal Involvement in Agricultural Credit Programs,* 19 S.D.L.Rev. 567, 567–80 (1974).

*Natural Resources Defense Council,* —— U.S. ——, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985). Though we may not uphold an interpretation contrary to the " 'clear meaning of a statute, as revealed by its language, purpose, and history,' " *Southeastern Community College v. Davis,* 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979) (quoting *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979) ), the agency's interpretation need not be shown to be the only permissible view. *Chemical Manufacturers,* 105 S.Ct. at 1108. If, upon our examination, Congress appears not to have actually formulated an intent with regard to removal of PCA officers, a finding that the FCA's interpretation of intermediate credit bank powers is rational and reasonable precludes us from substituting our own judgment on that issue. *See id; Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984).

The removal bylaw is not contrary to the express language of the Farm Credit Act of 1971. The statute at no point mentions removal of PCA chief executive officers, neither granting nor denying such power to either the FCA, intermediate credit banks, or the PCA's themselves. Bailey, however, asserts that the absence of an express reference to removal among the Bank's enumerated powers, *see* 12 U.S.C. § 2072, must indicate that Congress indeed possessed a specific intent to deny the existence of such a power.

Bailey first relies on the maxim of statutory construction "expressio unius est exclusio alterius"—i.e., the expression of one thing excludes others not expressed. Bailey asserts that since Congress set forth in section 2072 twenty-one powers to be vested in intermediate credit banks, all powers not so listed are denied to such banks. But this argument is actually too simple. The "expressio unius" maxim merely embodies a presumption that, rather than constitutes evidence that, Congress intended to deny all powers not expressly enumerated. *See Illinois Department of Public Aid v. Schweiker,* 707 F.2d 273, 277 (7th Cir.1983); *United Steelworkers v. Marshall,* 647 F.2d 1189, 1232 (D.C.Cir. 1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3149, 69 L.Ed.2d 997 (1981). As the Supreme Court said in considering an argument similar to Bailey's regarding the powers of the Interstate Commerce Commission,

> Our function * * * does not stop with a section-by-section search for the phrase 'regulation of leasing practices' among the literal words of the statutory provisions. As a matter of principle, we might agree with appellants' contentions if we thought it a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil sought to be corrected. But no great acquaintance with practical affairs is required to know that such prescience, either in fact or in the minds of Congress, does not exist.

*American Trucking Associations v. United States,* 344 U.S. 298, 309–10, 73 S.Ct. 307, 314, 97 L.Ed. 337 (1953). The applicability of "expressio unius" depends upon the intent of the drafters of a statute, and the maxim should be invoked only when other aids to interpretation suggest that the language at issue was meant to be exclusive. *Ford v. United States,* 273 U.S. 593, 611–12, 47 S.Ct. 531, 537, 71 L.Ed. 793 (1927) (quoting H. Broom, *A Selection of Legal Maxims* 653 (7th ed. 1874) ); *cf. Crancer v. Lowden,* 121 F.2d 645, 649 (8th Cir.1941) (doctrine of "expressio unius" not to be used to override a contrary intent). Specifically, "expressio unius" should not prevail when a nonexclusive reading serves the purposes for which the statute was enacted or allows the exercise of incidental authority necessary to an expressed power or right. 2A *Sutherland Statutory Construction* § 47.25, at 209 (Sands 4th ed. 1984 rev.).

The district court pointed to three main clauses in rejecting an exclusive read-

ing of section 2072 and finding the power of an intermediate credit bank to remove a PCA officer implicit in the scheme of the Farm Credit Act. First, section 2072(15) expressly gives an intermediate credit bank the power to approve the appointment and compensation of PCA chief executive officers. Second, the same section also gives an intermediate credit bank the power to "supervise the exercise by [PCA's] of the functions vested in or delegated to them," while third, section 2254 provides that PCA's are to be subject to annual audits that shall include "objective appraisals of the effectiveness of management and application of policies in carrying out the provisions of [the Farm Credit Act]." The power to control salary, the district court reasoned, means that an intermediate credit bank can at least indirectly terminate a PCA chief executive officer by refusing to approve compensation. *Bailey*, 608 F.Supp. at 1012. In addition, the court observed that the Farm Credit Act places no express limits on the power of an intermediate credit bank to remedy—for example, through removal of an officer—violations of farm credit policy found through audits. *Id.; see* 12 C.F.R. §§ 611.1010(i), 614.4050 (1985). Finally, the court looked to the function of an intermediate credit bank in ensuring sound farm credit and concluded that a bylaw giving such a bank the power to remove a PCA chief executive officer reasonably could be seen as an appropriate expression of intermediate credit bank general supervisory power. *Bailey*, 608 F.Supp. at 1012; *cf. American Truck-*

*ing*, 344 U.S. at 311, 73 S.Ct. at 315 ("It is an unnatural construction of the Act which would require the [administrative agency] to sit idly by and wink at practices that lead to violations of its provisions.").

We conclude that this grant of supervisory power plus the need for incidental powers to effectuate the purposes of the Act indicates that Congress did not intend its enumeration in section 2072 to be exclusive and that the "expressio unius" maxim thus is not applicable.[4]

Bailey further argues, however, that even if some intermediate credit bank powers may be implied as "supervisory," the power to terminate PCA officers is not one of those powers because Congress has shown that it knows how to grant removal power when it wishes. Specifically, Bailey points to some half dozen statutes that expressly mention removal, sometimes also with a separate grant of "supervisory" authority. While arguments such as Bailey's have frequently been adopted by courts in other circumstances, we are not persuaded here because of the dissimilarity between the Farm Credit Act and the statutes on which Bailey relies in terms of the overall structure of the legislation, the function of and autonomy accorded the entity whose officer is subject to removal, and the relationship between that entity and the body vested with removal power. Four of the statutes cited by Bailey involve relationships more like those between boards of directors and their own officers,[5] while the remainder involve relationships between

4. We are not dissuaded from this view by Bailey's additional argument, based on the "common law" of employment, that PCA's, despite the statutory silence, have the implicit authority as "employers" to remove their own chief executive officers, while intermediate credit banks, as "separate" organizations, need explicit authorization to interfere with PCA employment relationships. The high degree of control over PCA affairs which Congress has vested in intermediate credit banks (*see infra*) suggests that any such "common law" presumption should carry little weight in the present case. A PCA is not a private enterprise but an "instrumentality of the United States, created to carry out * * * congressional policy and objectives." 12 C.F.R. § 611.400 (1985); *cf. In re Sparkman*, 703 F.2d 1097, 1101 (9th Cir.1983) ("[P]roduction credit

associations are more than private institutions with a federal charter.").

5. 12 U.S.C. § 248(f) (1982) (power of Federal Reserve Board to suspend or remove for cause any director or officer of a federal reserve bank); 12 U.S.C. § 1432(a) (1982) (power of directors of Federal Home Loan Bank to dismiss at their pleasure officers of their Bank); 12 U.S.C. § 1819 (1982) (power of directors of Federal Deposit Insurance Corporation to dismiss at their pleasure Corporation officers); 22 U.S.C. § 2193(b), (c) (1982) (president and certain directors of Overseas Private Investment Corporation appointed by and serve at pleasure of President of the United States).

regulatory agencies and basically autonomous commercial ventures.[6] Intermediate credit banks and PCA's, however, are both day-to-day operating entities and are both within the farm credit system (the FCA is the regulatory body), and the former possess extensive statutory authority over the latter in pursuit of their mutual purpose of serving government farm credit policy. *See* 12 C.F.R. § 611.400 (1985) (quoted in part at n. 4 *supra* ).

For example, as already mentioned, the FCA has the power to issue and amend PCA bylaws, 12 U.S.C. § 2252(a)(2), and in fact any bylaw or amendment proposed by a PCA must be approved by the FCA prior to implementation. 12 C.F.R. § 611.1010(b) (1985). The FCA also approves PCA charters and may through these charters determine certain essential institutional attributes including the initial amount of stock of a PCA and the territory in which a PCA may operate. 12 U.S.C. § 2091. The FCA may change a PCA charter at any time, *id.,* and may declare a PCA insolvent or require two PCA's to merge. *Id.* § 2183; 12 C.F.R. § 611.1130 (1985). A PCA may not go into voluntary liquidation without FCA consent. 12 U.S.C. § 2183.

All of the powers of a PCA are subject to supervision by the appropriate intermediate credit bank and the FCA. *Id.* § 2093. Specifically, a PCA needs intermediate credit bank approval or authorization to invest its funds, to purchase and sell obligations of the United States, to borrow from financial institutions outside the farm credit system, and to participate in loans with other PCA's. *Id.* § 2093(10)–(13). Even when engaging in its primary function of making loans to farmers, a PCA must follow intermediate credit bank dictates governing interest rates, 12 C.F.R. § 614.4320 (1985), and loan terms, conditions, and security requirements. 12 U.S.C. § 2096(b); *e.g.,* 12 C.F.R. §§ 614.4200, .4250 (1985). Interme-

diate credit banks adopt lending standards, define "sound" loans and develop guidelines concerning loans to specialized or hazardous enterprises, establish minimum credit verification procedures, issue credit manuals, prescribe loan application forms and the contents of credit files, and set minimum standards for loan servicing and collection. 12 C.F.R. §§ 614.4040–.4050 (1985). Finally, a credit bank may limit the exercise of loanmaking authority by a PCA that exhibits poor judgment in extending and administering credit. *Id.* § 614.4030(a) (1985).

Bailey's examples of express grants of removal power within the Farm Credit Act itself are equally unpersuasive. For example, although section 2244 provides that the governor of the FCA serves "at the pleasure" of the Federal Farm Credit Board, the relationship therein addressed again is much like that between a board of directors and its own corporate officers and very little like that between two entities engaged in day-to-day operations, one being subordinate to and subject to the far-reaching control of the other. Similarly, while prior to 1971 the FCA had the express power to remove the single member it appoints to each district farm credit board and Congress specifically deleted that power, *see* H.R.Rep. No. 593, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Ad.News 2091, 2101, Congress consistent with that position could have felt necessary and meant to preserve a removal power implicit in intermediate credit banks due to the very different nature of their authority over PCA's. As mentioned earlier, PCA's in fact basically operate on intermediate credit bank money, since loans from intermediate credit banks are the primary source of funds loaned in turn by PCA's to farmers. We cannot believe that the express grant of a removal power in other varied circumstances signifies the existence

---

**6.** 12 U.S.C. § 1730(g) (1982) (power of Federal Savings & Loan Insurance Corporation to remove for certain violations and unsound practices officers and directors of insured associations); 12 U.S.C. § 1786(g) (1982) (same power to National Credit Union Administration Board in relation to officers and directors of insured credit unions); 12 U.S.C. § 1818(e) (1982) (same power to Federal Deposit Insurance Corporation in relation to officers and directors of insured banks).

of a clear congressional determination that the removal power was to be denied here.

Finally, Bailey argues that the power of removal as a matter of semantics cannot be implied as a "supervisory" power because it is a "management" power which, if exercised by intermediate credit banks, would defeat a stated congressional policy of "encourag[ing] farmer- and rancher-borrowers participation in the management, control, and ownership of a permanent system of credit for agriculture." 12 U.S.C. § 2001(b). He argues that allowing an intermediate credit bank to remove a PCA chief executive officer allows such a bank, under the ruse of "supervision," to substitute its "management" decisions for the PCA's "management" decisions, thus emasculating the PCA's statutory power of management and control.

As a semantic matter, however, the congressional declaration of objectives on which Bailey relies speaks only of borrower *participation* in farm credit system ownership, control, and management. Regardless of the existence or nonexistence of any removal power, borrowers participate in the farm credit system directly through their ownership of the PCA's, *id.* § 2094(b), and election of PCA directors, *id.* § 2092, and indirectly through the PCA's ownership of intermediate credit banks, *id.* § 2073(b), and election of farm credit district directors. *Id.* § 2223(a). PCA's thus as a group (by district) control the selection of the persons who hold the removal power over them.

Also semantically, the casual attachment of such imprecise labels as "supervisory" and "management" to various farm credit functions hardly seems sufficient to reveal—or effectuate—an alleged strict congressional determination regarding the limits of intermediate credit bank power. Use of the ordinary dictionary meanings of these terms in fact, given the other-than-ordinary relationship established by statute between PCA's and credit banks, likely would cut back on the banks' explicitly

enumerated powers, a result hardly consistent with congressional intent. The better view is that the complete statutory structure, with its accompanying implications, defines what powers may be considered "supervisory." *Cf. Chemical Manufacturers Association v. Natural Resources Defense Council,* —— U.S. ——, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985) (no plain meaning for the word "modify" as used in section 301(1) of the Clean Water Act).

To deny the existence of a removal power would give a PCA the ability to emasculate an intermediate credit bank's supervisory powers by making the bank unable to force a PCA to follow bank policies. The FCA—again in the congressional declaration of objectives—is charged with "furnishing sound, adequate, and constructive [farm] credit." 12 U.S.C. § 2001(a). FCA regulations "identify areas in which Systemwide and district policies for the guidance of management and operations of the banks and associations are necessary to assure the accomplishment of the Act's objectives," 12 C.F.R. § 611.200 (1985); *see* H.R.Rep. No. 593, *supra, reprinted* at 2102; and the intermediate credit bank or district board is directed to adopt consistent lending policies for PCA's, taking into consideration the "cooperative character" of the farm credit system and each institution's "integral part" in "the statutory scheme for the whole System." 12 C.F.R. § 611.1010(g) (1985). Each PCA is not an independent, autonomous venture entitled to operate as it pleases under the terms most favorable to its own borrowers regardless of the interests of the whole system. The goal of participation for borrowers cannot be primary to the goal of maintaining the soundness and existence of the institutions in which the borrowers wish to participate. As the district court stated, "If authorizing the credit bank to remove the [PCA] executive director conflicts with borrower control over the association, the conflict is inherent in the policy and objectives of the Farm Credit Act." *Bailey,* 608 F.Supp. at 1012.[7]

---

7. Bailey further argues that giving intermediate

credit banks removal power would force chief

Our deference to the administrative resolution of this conflict in powers is not made inappropriate, as Bailey contends, because the issue allegedly involves matters not within the agency's area of expertise. *Daley v. Farm Credit Administration*, 454 F.Supp. 953 (D.Minn.1978), on which Bailey relies, involved an FCA regulation establishing an age limit of seventy for members of district boards of directors. Less deference to the agency's decision was required, the court suggested, because age restrictions had little to do with the substantive concerns of the Farm Credit Act and because the FCA had no expertise with respect to aging. *Id.* at 955. The FCA bylaw concerning the removal of PCA officers, to the contrary, is integrally related to the congressional purpose of ensuring the availability of sound agricultural credit, and the FCA's peculiar knowledge of the inner workings of the farm credit system make it well-suited to evaluate the need of the various farm credit institutions for incidental and implied powers to effectuate their enumerated powers.

Having concluded that the exercise of removal power by intermediate credit banks "is not inconsistent with the language, goals, or operation of the [Farm Credit] Act," *see Chemical Manufacturers*, 105 S.Ct. at 1112, we must uphold the agency's choice to give intermediate banks this power so long as the choice represents a reasonable policy decision. *See Chevron*, 104 S.Ct. at 2783. As stated by the district court, vesting removal power in intermediate credit banks "assures that the [PCA] chief operating officer will follow [FCA] policies"; and "[c]ompliance with the operating policies of the FCA and the supervising credit bank is entirely consistent with

Congress' interest in providing an effectively managed, sound farm credit system." *Bailey*, 608 F.Supp. at 1012. We affirm the grant of summary judgment in favor of the Bank.

---

executive officers to "serve two masters with different ideas and policies." He offers in his brief as an example a disagreement between his Osage PCA and the St. Louis Credit Bank concerning the method of collecting (and thus indirectly, the amount of) interest. As outlined earlier, however, the statute and regulations give intermediate credit banks extensive control over interest rates and loan servicing: Bailey's argument really seeks a privilege to flout intermediate credit bank authority. Thus, *Ponca*

*City Production Credit Association v. United States,* 275 F.Supp. 502 (W.D.Okla.1967) (decided under pre-1971 farm credit system), in which a district court upheld the removal by the FCA of a PCA officer, cannot be distinguished, as Bailey contends, as involving a violation by the PCA officer of a farm credit regulation. *See also* 12 C.F.R. § 614.4060 (1985) (PCA's are to exercise their authority in compliance with guidelines of district intermediate credit banks).