# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 13-1251

———————————————

Reggie White; Michael Buck; Hardy Nickerson; Vann McElroy; Dave Duerson

*Plaintiffs - Appellants*

NFL Players Association

*Movant - Appellant*

v.

National Football League; The Five Smiths; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; The Dallas Cowboys Football Club, Ltd; PDB Sports, Ltd.; The Detroit Lions, Inc.; The Green Bay Packers, Inc.; Houston Oilers, Inc.; Indianapolis Colts, Inc.; Kansas City Chiefs Football Club, Inc.; The Los Angeles Raiders, Ltd.; Los Angeles Rams Football Company, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; KMS Patriots Limited Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; B&B Holdings, Inc.; Pittsburgh Steelers Sports, Inc.; The Chargers Football Company; Tampa Bay Area NFL Football Club, Inc.; Pro-Football, Inc.; The Philadelphia Eagles Football Club, Inc.; Cleveland Browns, Inc.; The Seattle Seahawks, Inc.; The New Orleans Saints Limited Partnership; The San Francisco Forty-Niners, Ltd.

*Defendants - Appellees*

———————————————

No. 13-1480

———————————————

Reggie White; Michael Buck; Hardy Nickerson; Vann McElroy; Dave Duerson

*Plaintiffs - Appellants*

NFL Players Association

*Movant - Appellant*

v.

National Football League; The Five Smiths; Buffalo Bills, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; The Dallas Cowboys Football Club, Ltd; PDB Sports, Ltd.; The Detroit Lions, Inc.; The Green Bay Packers, Inc.; Houston Oilers, Inc.; Indianapolis Colts, Inc.; Kansas City Chiefs Football Club, Inc.; The Los Angeles Raiders, Ltd.; Los Angeles Rams Football Company, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club, Inc.; KMS Patriots Limited Partnership; New York Football Giants, Inc.; New York Jets Football Club, Inc.; B&B Holdings, Inc.; Pittsburgh Steelers Sports, Inc.; The Chargers Football Company; Tampa Bay Area NFL Football Club, Inc.; Pro-Football, Inc.; The Philadelphia Eagles Football Club, Inc.; Cleveland Browns, Inc.; The Seattle Seahawks, Inc.; The New Orleans Saints Limited Partnership; The San Francisco Forty-Niners, Ltd.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: January 14, 2014
Filed: June 20, 2014

_____

Before RILEY, Chief Judge, WOLLMAN and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

-2-

Legendary defensive end Reggie White passed away in 2004, but the class action that bears his name lives on in federal court. In 1993, a class of plaintiffs represented by White settled an antitrust lawsuit with the National Football League (NFL or League) by signing an extensive collective bargaining agreement, the Stipulation and Settlement Agreement (SSA), that governed labor relations between the League and its players for almost two decades. In 2011, the NFL Players' Association and several law firms authorized to represent NFL players (collectively, the Association) sued the League, asserting that the League had violated the SSA in 2010 by instituting a secret cap on player salaries. The League and the Association settled this lawsuit as well, this time by signing a Stipulation of Dismissal (the Dismissal). The Association now seeks to set aside the Dismissal and reopen its breach-of-SSA claim against the League, on two grounds. First, the Association asserts that the Dismissal is invalid because the district court never approved it as required by Federal Rule of Civil Procedure 23(e). Second, the Association asserts that the Dismissal should be set aside under Federal Rule of Civil Procedure 60(b) because the League procured the Dismissal by fraud, misrepresentation, or misconduct. The district court rejected both arguments, and we affirm in part and reverse and remand in part.

I.

The NFL is a league of thirty-two independently owned football teams that operate primarily in the United States. The NFL Players' Association is a labor union that represents NFL players. This case has its roots in the often turbulent relationship between these two organizations.

This turbulence is largely the product of the League's unique legal status as a permissible combination in restraint of trade. See Am. Needle v. Nat'l Football League, 560 U.S. 183, 203 (2010); see also Sherman Act § 1, 15 U.S.C. § 1. Normally, cooperation between ostensible competitors to fix prices, reduce output,

or divide territory is illegal.  But the normal laws of economics do not always apply in football: cooperation off the field often promotes competition on it.  The college draft, for instance, allows the worst professional teams to select the best college players, rather than allowing the best college players to sign with the best professional teams (or those in the largest markets).  This rule promotes league-wide parity even as it restrains a player's freedom to choose which team to play for.  Because facially anticompetitive league rules like these can have counterintuitively procompetitive effects, courts are often hesitant to second-guess League decisions from an antitrust perspective, preferring instead to evaluate League conduct under the deferential Rule of Reason.  See American Needle, 560 U.S. at 203.

Occasionally, the League exploits this deference.  In 1963, the League instituted the Rozelle Rule, which provided that when a player's contract with one team expired, that player could not sign with a different team unless the acquiring team compensated the player's former team, usually by sending that team draft picks.  Because teams were reluctant to part with draft picks, bidding over free agents stalled, and player salaries fell.  In 1976, this court determined that the Rozelle Rule violated the Sherman Act, see Mackey v. Nat'l Football League, 543 F.2d 606, 622 (8th Cir. 1976), but the League thereafter continued to institute variations of the Rozelle Rule that were upheld in the courts, see Powell v. Nat'l Football League, 930 F.2d 1293, 1303-04 (8th Cir. 1989).

NFL players have historically employed two defense mechanisms in response to the League's dominant market position: unionization and litigation.  Unionization theoretically levels the playing field between the players and the League by uniting the players under one banner, while litigation keeps the League from overstepping its authority under the Rule of Reason.  Because collectively bargained agreements are resistant to antitrust attack, see Brown v. Pro Football, Inc., 50 F.3d 1041, 1048 (D.C. Cir. 1995), these defense mechanisms are usually mutually exclusive.  Thus, labor

-4-

relations in the NFL have seesawed between attempts at collective bargaining and flurries of antitrust lawsuits.

In the 1980s, the players' tactic of choice was unionization. Players went on strike twice during that decade, once in 1982 and again in 1987. The 1982 strike, which lasted for fifty-seven days, earned the players a few modest concessions from the League. But the 1987 strike was disastrous for the players. In response to the strike, the League signed replacement players and continued to stage games, retaining most of its television revenue while saving costs by paying replacement players lower salaries. After twenty-four days, a fractured players' union voted to end the strike with no new collective bargaining agreement in place. And in 1989, the union elected to decertify so that individual players could once again resort to suing the League for antitrust violations.

This case began as one such suit. In 1992, Reggie White and four other players sued the League on behalf of all other NFL players, asserting that the League's free agency system, the college draft, the League's practice of using standard-form contracts, and several other League rules violated the antitrust laws. See White v. Nat'l Football League, 822 F. Supp. 1389, 1394 (D. Minn. 1993). The district court certified a class of plaintiffs consisting of

> (i) all players who have been, are now, or will be under contract to play professional football for an NFL club at any time from August 31, 1987 to the date of final approval of the settlement of this action and the determination of any appeal therefrom, and (ii) all college and other football players who, as of August 31, 1987, to the date of final approval of the settlement of this action and the determination of any appeals therefrom, have been, are now, or will be eligible to play football as a rookie for an NFL team.[1]

---

[1] The "date of final approval" ended up being June 12, 1995, the date on which the Supreme Court denied a petition for a writ of certiorari seeking review of the

See White, 822 F. Supp. at 1395 (D. Minn. 1993). While the White lawsuit was pending, the League and its players began to negotiate a deal they hoped would put an end to the labor skirmishes that had plagued their relationship in the past. These negotiations culminated on February 26, 1993, with the signing of the SSA. Although the SSA was styled as a settlement of the White lawsuit, it operated as a comprehensive collective bargaining agreement governing all aspects of labor relations between the League and its players. The SSA awarded monetary relief to each member of the White class to compensate them for the League's alleged antitrust violations, but it also set forth rules encompassing free agency, the college draft, player salaries, and a host of other labor-related issues. The district court retained the jurisdiction to enforce the terms of the SSA through a Final Consent Judgment filed in the White docket, see D. Ct. Order of Aug. 20, 1993, and appointed a special master to hear claims asserting violations of the SSA.

The SSA heralded a new era of labor peace between the NFL and its players. Although the SSA was originally set to expire in 1996, the League and Association agreed to extend the SSA four times, in 1996, 2000, 2002, and 2006. Each time, the district court held a conference of the parties and instructed them to provide notice of the amendment to all players under contract with an NFL team at the end of the season in the year the SSA was extended. All new players who entered the NFL after the SSA was signed, even those not part of the original White class, became subject to the rules of the SSA. Likewise, expansion teams who joined the NFL after 1993, such as the Carolina Panthers, were governed by the SSA.

---

district court's approval of the SSA. See Dusbabek v. Nat'l Football League, 515 U.S. 1137 (1995). Thus, the White class ultimately included all players who were under contract with an NFL team at any point from August 31, 1987, to June 12, 1995, and all other players eligible to play in the NFL as a rookie during that time.

In 2008, the NFL became dissatisfied with the SSA and decided not to extend the agreement. The final year of the SSA became 2010. The SSA mandated that "[t]he Final League Year shall always be an Uncapped Year." This meant that during the 2010 season, the SSA would impose no limit on the amount of money that teams could pay their players. The players expected that the absence of a salary cap in 2010 would lead to a marked increase in player salaries, but this increase never occurred and salaries remained stable during 2010. The players began to suspect that NFL teams were colluding to avoid bidding wars over free agents that might otherwise result from the lack of a salary cap. On January 10, 2011, the Association filed a complaint with Special Master Stephen Burbank alleging that the League was colluding to suppress competition for free agents during the 2010 season.

The SSA expired on March 11, 2011, with no new agreement in place, leading to a flood of renewed litigation. The NFL owners agreed to "lock out" the players by shutting down all league operations until a new labor agreement could be signed. In response, the players' union decertified and several players sued the NFL for antitrust violations. See Brady v. NFL, 640 F.3d 785 (8th Cir. 2011). The Association's collusion suit before Special Master Burbank remained pending during this time.

In August 2011, the League and the Association came to terms on a new collective bargaining agreement. As part of this new agreement, the two sides settled the various lawsuits between them. The League and the Association settled the lawsuit over the alleged secret salary cap by signing the Dismissal under Federal Rule of Civil Procedure 41(a)(1)(A)(ii), filed in the White docket on August 4, 2011. In the Dismissal, the Association agreed to dismiss with prejudice "all claims, known and unknown, whether pending or not, regarding the Stipulation and Settlement

-7-

Agreement ('SSA') including but not limited to claims asserting . . . collusion with respect to the 2010 League Year."[2]

After the Dismissal was signed, several NFL owners made public statements about the League's alleged collusion in 2010. New York Giants owner John Mara, for instance, stated in an interview that the Dallas Cowboys and Washington Redskins acted "in violation of the spirit of the salary cap" by "attempt[ing] to take advantage of a one-year loophole," referring to the lack of a salary cap in 2010. See Dan Graziano, Mara: Redskins, Cowboys Got Off "Lucky," ESPN.com (Mar. 25, 2012, 2:35 PM), http://espn.go.com/blog/nfceast/post/_/id/37413/john-mara-redskins-cowboys-got-off-lucky. NFL Commissioner Roger Goodell similarly referred to an unofficial salary cap in 2010 at a press conference in March 2012. See Dan Graziano, No Date Set for Cap Penalty Hearings, ESPN.com (Mar. 28, 2012, 2:27 PM), http://espn.go.com/blog/nfceast/post/_/id/37565/goodell-no-date-set-for-cap-penalty-hearings. The Association interpreted these statements as admissions that the NFL had colluded during the 2010 season to institute a secret salary cap in violation of the SSA. On May 23, 2012, the Association petitioned the district court to reopen and enforce the SSA so that it could pursue its collusion claim against the NFL armed with this new evidence. When the NFL asserted that the Association had settled this claim in the Dismissal, the Association countered that the Dismissal was invalid because the district court had never approved the settlement, as required by Rule

---

[2]The Dismissal made a small exception for the "pending claim . . . relating to an alleged rookie shortfall on the part of the Philadelphia Eagles." The Association asserts for the first time on appeal that Federal Rule of Civil Procedure 41 provides an independent reason to set aside the Dismissal. According to the Association, the Dismissal is invalid because it did not dismiss the entire "action" as allegedly required by Rule 41(a). The Association waived this argument by failing to raise the Rule 41 issue to the district court until its reply brief, see Akeyo v. O'Hanlon, 75 F.3d 370, 374 n.2 (8th Cir. 1996), and then raising it only in response to the NFL's jurisdictional attack on its Rule 60(b) motion, not as an independent reason to set aside the Dismissal.

23(e). After the court denied the Association's petition, the Association moved under Rule 60(b) to set aside the Dismissal on the ground that the League had procured the Dismissal by fraud, misrepresentation, or misconduct. The district court denied the motion.

## II.

The sole issue on appeal is whether the Dismissal bars the Association's claim for collusion during the 2010 season. The Association does not contest that the Dismissal, by its terms, purports to bar this lawsuit. Instead, the Association seeks to circumvent the Dismissal in two ways: first, by asserting its invalidity under Rule 23(e); and second, by asking the court to set aside the Dismissal under Rule 60(b). The district court rejected both arguments after concluding that the Rule 23(e) procedures were not required prior to the Dismissal and that Rule 60(b) relief is unavailable to a party who stipulates to a dismissal under Rule 41(a)(1)(A)(ii). We review both of these legal conclusions *de novo*. Haynes v. Stephenson, 588 F.3d 1152, 1155 (8th Cir. 2009).

### A.

The Association first asserts that the Dismissal is invalid because it purported to settle the claims of a certified class without the court approval required by Rule 23(e). We do not believe Rule 23(e) applies, however, because we do not believe that the claims settled in the Dismissal were the claims "of a certified class." See Fed. R. Civ. P. 23(e).

Rule 23(e), as amended in 2003, mandates that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Our reading of Rule 23(e) is informed by Rule 23(c)(1)(B), adopted that same year, which states that "[a]n order that certifies a class

-9-

action must define the class and the class claims, issues, or defenses." By instructing courts to define the "claims, issues, or defenses" of a certified class in the certification order, Rule 23(c)(1)(B) implies that the "claims, issues or defenses" referred to in Rule 23(e) generally are those that exist at the time of class certification.

The parties in this case stipulated to class certification on February 17, 1993. One day later, the Association filed its second amended complaint, which challenged the NFL's "Plan B" free agency system, the college draft, the NFL's use of a standard-form player contract, the NFL's practice of fixing medical insurance benefits, and the NFL's system of preseason pay.

The alleged imposition of a salary cap in 2010 is unrelated to any of these claims. Eighteen years elapsed between the events at issue in White and the NFL's alleged collusion in 2010. These two sets of allegations involve different plaintiffs, different defendants, and different conduct. The two are linked peripherally by the SSA, which settled the 1993 claims and gave rise to the 2010 claim, but Rule 23(e) "in no way suggests that negotiated resolutions of disputes peripheral to the class action need be approved." Duhaime v. John Hancock Mut. Life Ins. Co., 183 F.3d 1, 4 (1st Cir. 1999).[3]

The Association argues, nonetheless, that this link is sufficient. According to the Association, because the allegations settled in the Dismissal asserted violation of a class settlement, those allegations were the claims "of a certified class." Rule 23(c)(1)(B) casts considerable doubt onto this argument by suggesting that the claims, issues, and defenses of a class are determined at certification, not at the breach of a settlement. The Association objects to this interpretation of Rule 23(e) as a matter of policy, asserting that without judicial oversight, collusive plaintiffs and defendants

_____

[3]The court in Duhaime was interpreting a prior version of Rule 23(e), but we agree with the NFL that the Duhaime court's logic applies with equal force to the current version of Rule 23(e).

-10-

could settle breach-of-settlement claims in ways that benefit the named plaintiffs at the expense of the rest of the class. But if settlement breaches do not automatically give rise to class claims, as Rule 23(c)(1)(B) suggests, then representative plaintiffs have no authority to bind the absent members of a class by settling those claims, and no court approval would be necessary to protect the interests of absent class members. Moreover, if the breach of a class settlement affects a large enough subset of a class, a district court could recertify the class (or a different class composed only of affected class members) to pursue a breach-of-settlement claim.

Even crediting the Association's argument that the breach of a class settlement may give rise to the claim of a certified class, Rule 23 procedures would still not be required here, because the SSA is not a true class settlement in most respects. A typical class settlement provides class members monetary and injunctive relief in exchange for the forfeiture of their legal claims against a defendant. The SSA, by contrast, is a comprehensive collective bargaining agreement that sets the terms of employment between the League and its players. The concessions made by the League in the SSA were not given to the players in exchange for the forfeiture of their legal claims against the League; they were given to the players in exchange for their agreement to play football for the League. The League's willingness to extend the SSA four times illustrates this fact. If the SSA were truly part of a deal extracted by the players in exchange for the forfeiture of their legal claims, the NFL would have no incentive to extend the SSA, since the players would have already used their primary bargaining chip—the stipulated dismissal of their antitrust claims. But since the players' true bargaining chip was their labor, the NFL was willing to extend the SSA four times without substantial modification.

Without the conceit that the SSA is a bargained-for result of the White litigation, the rationale for treating it as a class settlement begins to fall apart. When a defendant breaches a class settlement, he vitiates the consideration received by the plaintiffs in exchange for the forfeiture of their legal rights. But when a defendant

breaches an independent contract signed with members of the class, the legal rights of the class at issue in the lawsuit are not implicated. The mere fact that a class has suffered a harm, seventeen years after they were certified for purposes of unrelated litigation, does not mean that they may seek redress for that harm as a class.

For the most part, the parties themselves have treated the SSA as if it were a normal contract, not a class settlement. Over the life of the SSA, the Association filed numerous complaints for violation of the SSA on behalf of players, and neither the parties nor the court ever invoked Rule 23 in litigating these claims. When the district court entered judgments interpreting sections of the SSA, for example, it did so without reference to Rule 23(c)(3), which mandates that the judgment in a class action "include and describe those whom the court finds to be class members." See, e.g, White v. Nat'l Football League, 533 F. Supp. 2d 929 (D. Minn. 2008); White v. Nat'l Football League, 899 F. Supp. 410 (D. Minn. 1995). And when the parties settled claims alleging violations of the SSA, they did not file these settlements on the White docket or follow Rule 23(e) procedures. See, e.g., John Clayton, Ravens' Suggs to be Designated as a Franchise Defensive End-Linebacker, ESPN.com (Mar. 17, 2004, 7:01 PM), http://sports.espn.go.com/nfl/news/story?id=3394771.

The only time the parties did invoke Rule 23 was when they agreed to extend the SSA itself. And even then, the parties did not actually abide by the Rule. Rule 23(e)(1) requires the court to provide notice "to all class members who would be bound by the proposal." But in extending the agreement, the parties provided notice not to the White class but to an entirely different subset of players—players who were under contract with an NFL team at the end of the season in the year the amendment took effect. White class members who had temporarily retired, who were free agents, or who were playing in another league when the SSA was extended were thus never given notice of the amendment. In short, the parties have never treated the SSA like a class settlement, and we see little reason to start doing so now.

We acknowledge that some specific provisions of the SSA might reasonably be considered elements of a class settlement. Article XII, for example, which provides monetary relief to members of the <u>White</u> class for the NFL's alleged antitrust violations prior to 1993, is reasonably characterized as part of a bargain extracted by the <u>White</u> plaintiffs in exchange for the forfeiture of their legal claims against the NFL. But other sections of the SSA, such as the sections governing minimum salaries, franchise player tags, and the salary cap, are unrelated to the <u>White</u> class's antitrust claims. We do not believe that, realistically, the whole of the SSA was given to the <u>White</u> class in exchange for the forfeiture of their claims against the League. The SSA was desired by both the League and its players. It put an end to twenty-three different lawsuits, including <u>White</u>, and fundamentally rewrote the NFL's labor rules. It governed players and teams who entered the NFL long after <u>White</u> was settled. And it contained provisions that were never challenged or even contemplated by the <u>White</u> plaintiffs.

The section of the SSA at issue in this case, Article XI, is one such provision. Article XI, which mandates that the final League year be uncapped, was inserted into the SSA to give the League an incentive to renew the SSA before the last year of the agreement. This provision does not vindicate any of the claims asserted by the <u>White</u> class; it merely penalizes the League for waiting until the last minute to extend the SSA. Because we do not believe that this provision was truly awarded to the players in exchange for the forfeiture of their legal claims against the NFL, we do not believe that the NFL's alleged breach of this provision gave rise to a class claim.

Finally, even if we were to treat the SSA as a bona fide class settlement, we would be hesitant to impose Rule 23(e) requirements on a settlement that affects only a tiny fraction of the <u>White</u> class. Like the ship of Theseus, whose planks were replaced one by one until no original plank remained, the player composition of the NFL has undergone a slow but thorough transformation since 1993 as the members of the <u>White</u> class have gradually retired. The average length of an NFL career is

roughly three-and-a-half years, and even the best NFL players rarely play for much longer than a decade. The youngest members of the White class entered the League in 1995. By 2010, all but a handful of those players had retired; they were replaced by a new crop of NFL players, many of whom were in grade school when the SSA was signed.

The Association asserts that the dwindling numbers of the White class are irrelevant. But the burden of showing that class litigation is appropriate generally remains on the plaintiff at all times during litigation. See Marlo v. United Parcel Serv., Inc., 639 F.3d 942, 947-48 (9th Cir. 2011); Ezell v. Mobile Housing Bd., 709 F.2d 1376, 1380 (11th Cir. 1983). Indeed, so important are the Rule 23 class prerequisites that courts often decertify classes *sua sponte*, even at the appellate level, after finding that class litigation is no longer appropriate or that the class has become obsolete. See Rector v. City & County of Denver, 348 F.3d 935, 949 (10th Cir. 2003); Barney v. Holzer Clinic, Ltd., 110 F.3d 1207, 1213-14 (6th Cir. 1997). Given the importance placed on class certification at all stages of litigation, we think it is relevant that at the time of the alleged breach, the remaining members of the White class, taken together, likely would have failed to meet the criteria for class certification set forth in Rules 23(a) and (b). Because it is unlikely that the affected members of the White class could constitute a class in their own right, we do not believe that the alleged imposition of a salary cap in 2010 gave rise to the claim "of a certified class."

Thus, because the White class never asserted any of the claims settled in the Dismissal, because these claims did not arise from a bargained-for class settlement, because the parties themselves have never treated the SSA like a class settlement, and because only a handful of the White class members were affected by the Dismissal, we conclude that the failure of the court and the litigants to abide by the class settlement procedures of Rule 23(e) did not invalidate the Dismissal.

-14-

B.

The Association next asserts that, even if the Dismissal is valid, the district court erred in prohibiting the Association from seeking relief from the Dismissal under Rule 60(b). Rule 60(b)(3) permits the court to set aside a "final judgment, order, or proceeding" that was obtained by "fraud . . . , misrepresentation, or misconduct." The district court denied the Association's Rule 60(b) motion on jurisdictional grounds, concluding that relief under the Rule is unavailable to a party that stipulates to the dismissal of a lawsuit under Rule 41(a)(1)(A)(ii) because such a dismissal does not constitute a "judgment, order, or proceeding" under Rule 60(b). Reviewing this conclusion of law *de novo*, Haynes, 588 F.3d at 1155, we reverse.

This is not the first time we have considered this question. In two previous unpublished opinions, we held that a dismissal under Rule 41(a)(1)(A) is not a "judgment, order, or proceeding" and that a party that stipulates to the dismissal of a lawsuit may not seek to set aside that dismissal under Rule 60(b). See Ajiwoju v. Cottrell, 245 F. App'x 563, 565 (8th Cir. 2007) (per curiam); Scher v. Ashcroft, No. 91-2661, 1992 WL 83547, at *1 (8th Cir. April 29, 1992) (per curiam). These decisions are not binding precedent, see 8th Cir. R. 32.1A; United States v. Marston, 517 F.3d 996, 1004 n.5 (8th Cir. 2008), but they are relevant insofar as they have "persuasive value," 8th Cir. R. 32.1A, and the district court relied on these two opinions in denying the Association's Rule 60(b) motion. Six other circuits have also considered this question, and all six have reached the opposite conclusion: that a Rule 41(a)(1)(A) dismissal constitutes a "judgment, order, or proceeding" under Rule 60(b) and that relief under the Rule is thus available to a party that stipulates to the dismissal of a lawsuit. See Yesh Music v. Lakewood Church, 727 F.3d 356, 362-63 (5th Cir. 2013); Nelson v. Napolitano, 657 F.3d 586, 589 (7th Cir. 2011); In re Hunter, 66 F.3d 1002, 1004-05 (9th Cir. 1995); Smith v. Phillips, 881 F.2d 902, 904 (10th Cir. 1989); Hinsdale v. Farmers Nat'l Bank & Trust Co., 823 F.2d 993, 995-96; (6th Cir. 1987); Randall v. Merrill Lynch, 820 F.2d 1317, 1320 (D.C. Cir. 1987).

-15-

We conclude that our sister circuits have the better of this issue. Specifically, we agree with those circuits that have held that a stipulated dismissal constitutes a "judgment" under Rule 60(b). See Merrill Lynch, 820 F.2d at 1320; McCall-Bey v. Franzen, 777 F.2d 1178, 1190 (7th Cir. 1985). Rule 54 states that "'[j]udgment' as used in these rules includes a decree and any order from which an appeal lies." Fed. R. Civ. P. 54(a). While at times "the expression of one thing excludes others not expressed," Bailey v. Fed. Intermediate Credit Bank of St. Louis, 788 F.2d 498, 500 (8th Cir. 1986), "[w]hen a statute uses the word 'includes' rather than 'means' in defining a term, it does not imply that items not listed fall outside the definition." United States v. Whiting, 165 F.3d 631, 633 (8th Cir. 1999); see also United States v. Mass. Bar Transp. Auth., 614 F.2d 27, 28 (1st Cir. 1980) ("'[I]ncludes' is not a finite word of limitation; its use destroys the basis for implying the negative."). Rule 54 thus leaves unresolved the question whether a judgment includes a stipulated dismissal.

Other Rules, however, explicitly use "judgment" to refer to a settlement between a plaintiff and defendant. Rule 68, for example, entitled "Offers of Judgment," permits a defendant to "serve on an opposing party an offer to allow judgment on specified terms." If the plaintiff accepts this offer, the clerk enters judgment in the amount stipulated and the lawsuit ends; if the plaintiff rejects the offer, the case proceeds to trial, but if the defendant ultimately prevails, the plaintiff is liable for the defendant's costs from the time of the offer until the end of the lawsuit.

In nearly all relevant respects, an accepted offer of judgment is identical to a stipulated dismissal under Rule 41(a)(1)(A)(ii). Both may operate as adjudications upon the merits. See Merrill Lynch, 820 F.2d at 1320. Both are executed by the parties without any involvement by the court. See Ramming v. Nat. Gas Pipeline Co. of America, 390 F.3d 366, 370 (5th Cir. 2004) ("A Rule 68 Offer of Judgment is usually considered self-executing."). Neither may be appealed. Mock v. T.G. & Y

Stores Co., 971 F.2d 522, 526 (10th Cir. 1992).  And, perhaps most importantly, both are susceptible to fraudulent conduct on the part of one of the negotiating parties. Although an offer of judgment differs from a stipulated dismissal in that the former requires the clerk to enter a formal judgment in favor of the plaintiff, the court itself exercises no review over the judgment.  Rather, the court's involvement is limited to filing the judgment on the docket, just as a clerk files a stipulated dismissal.  See Perkins v. U.S. West. Commc'ns, 138 F.3d 336, 338 (8th Cir. 1998) ("Rule 68 leaves no discretion in the district court to do anything other than enter judgment once an offer of judgment has been accepted.").  Indeed, the only material difference between a Rule 68 offer of judgment and a Rule 41(a)(1)(A)(ii) stipulated dismissal is that an offer of judgment shifts some of the potential costs of litigation to the plaintiff as a way of encouraging settlement.  In all other respects, the two means of settlement are functionally equivalent.  That the Rules call one of these means a "judgment" strongly suggests that the drafters would have intended to treat the other as a judgment as well. See Merrill Lynch, 820 F.2d at 1320. ("Because the voluntary dismissal in this case operated as an adjudication on the merits, it was a 'final judgment' under Rule 60(b).").

More generally, the concerns that underlie Rule 60(b) are equally as present after a stipulated dismissal as they are after a court-ordered end to litigation.  The Rule is designed to prevent injustice by allowing a court to set aside the unjust results of litigation.  See MIF Realty L.P. v. Rochester Assocs., 92 F.3d 752, 755 (8th Cir. 1996). The Rules give no indication that the drafters were concerned with how those results come about, nor do we see why such a distinction should matter.  The Federal Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding,"  Fed. R. Civ. P. 1; see also Matter of Am. Precision Vibrator Co., 863 F.2d 428, 429 (5th Cir. 1989) ("Equitable considerations mandate that we interpret the Federal Rules of Civil Procedure liberally to avoid miscarriages of justice."), and Rule 60(b) in particular "should be liberally construed when substantial justice will thus be served," Cornell

v. Nix, 119 F.3d 1329, 1332 (8th Cir. 1997) (quoting Mohammed v. Sullivan, 866 F.2d 258, 260 (8th Cir. 1989)). Given the ambiguous definition of "judgment" in Rule 54, the use of "judgment" in Rule 68 to refer to settlement, and the salutary reasons for permitting a settling party to seek relief from a fraudulent settlement, we conclude that the Association may seek Rule 60(b) relief from the Dismissal.

Our holding should not be read as in any way expressing a view on the merits of the Association's Rule 60(b) motion. "Rule 60(b) authorizes relief in only the most exceptional of cases," In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., 496 F.3d 863, 866 (8th Cir. 2007) (quoting Noah v. Bond Cold Storage, 408 F.3d 1043, 1045 (8th Cir. 2005)), and the Association bears a heavy burden in attempting to convince the district court that the Dismissal was fraudulently procured. We hold only that the Association should be given the opportunity to meet this burden.

III.

Accordingly, we affirm the district court's Rule 23 ruling, reverse the district court's Rule 60 ruling, and remand for further proceedings consistent with this opinion.

_____